In re RANDY B.

No. 83–579–Appeal.

Supreme Court of Rhode Island.

Jan. 22, 1985.

Joseph A. Capineri, Pawtucket, for plaintiff.

William J. Gearon, Keough, Parker, Gearon & Viner, Pawtucket, for defendant.

OPINION

WEISBERGER, Justice.

This case comes before us on appeal from an adjudication of delinquency entered in the Family Court. In this appeal we have been asked to review (1) whether the trial justice erred in determining that the juvenile was delinquent and (2) whether the trial justice's order of restitution violated the provisions of G.L.1956 (1981 Reenactment) §§ 14–1–32, as amended by P.L. 1983, ch. 251, § 1, and 14–1–32.1, as amended by P.L.1982, ch. 220, § 1. We hold that the Family Court justice committed no error in this case in his finding of delinquen-

cy or in the manner of imposing sanctions in respect to this juvenile, including the order of restitution.

The facts of this case arose out of a petition brought by the Pawtucket police department against Randy B. (Randy), who was then sixteen years old. The petition alleged that during March and April of 1983, Randy obtained $22,730 by false pretenses from Miss K. Doe[1] (Doe), aged eighty-six, in violation of G.L.1956 (1981 Reenactment) § 11–41–4.

At trial Doe testified that some time during the middle part of March 1983, she engaged Randy to do some minor repairs in her home. In order to pay for the patching of ceiling holes in her kitchen and laundry room and for the installation of a clapboard to the back of her house, she drew a total of eight checks, which she made out to herself and later cashed, to pay Randy. The checks ranged in amounts of $500 to $3,100 and were dated between March 17 and April 7 of 1983.[2]

On one occasion, Randy accompanied Doe to the bank while Doe attempted to cash a check for $3,000, the proceeds of which would be paid over to Randy for "materials." A teller at the bank, suspecting something amiss, thereafter ascertained that Doe had recently drawn and cashed a number of large checks. After conferring with her supervisor, the teller returned to Doe and stated that if such a large amount of cash was needed, a cashier's check would have to be drawn. (The teller later testified that she thought it advisable to record such a significant monetary transaction.) At this point, Randy was summoned to join Doe and the teller. A cashier's check was then made out to Randy. In order for him to cash that instrument, the teller required that Randy endorse the cashier's check and produce his driver's license. The teller subsequently wrote Randy's license number on the check and thereafter handed him an envelope containing the cash proceeds of the check.

After being called to the stand, Randy denied ever having entered into any agreement with Doe for repairs to her home. He did admit, however, that he accompanied her to the bank, and he stated that while waiting for Doe, he was called over to sign some piece of paper. He stated further that he was unsure of what he was signing but also temporarily handed over his driver's license to the teller. In return, he was given a sealed envelope that he claims he later turned over to Doe upon arrival back at Doe's home.

After hearing the testimony of all the witnesses, the Family Court justice concluded that Randy had defrauded Doe of the proceeds of the eight checks that had all been drawn within a short time span. These checks amounted to thousands of dollars and were entirely out of proportion to the value of the few minor repairs made to Doe's home. While noting that Doe seemed confused at times during her testimony, the trial justice found that Doe nevertheless was lucid enough to understand the events that had occurred and could positively identify Randy as the person to whom she had turned over the cash from the large amounts she had drawn from the bank.

The linchpin of the testimony, according to the Family Court justice, however, was the identification of Randy by both the bank teller and her supervisor as the youth to whom the cashier's check had been issued. When coupled with the tangible evidence of that cashier's check drawn to, and endorsed by, Randy for $3,000, the trial justice concluded that both circumstantial and direct evidence pointed to Randy's fraudulent receipt of the money in question. Accordingly, the Family Court justice entered a finding of delinquency and ordered the probation department to prepare a background report that would be used in assisting the court in ordering disposition.

---

**1.** This is not the victim's real name, but is used in order to protect her privacy.

**2.** *See infra* note 4.

At a disposition hearing some four weeks later, the Family Court justice reiterated his findings and committed Randy until age twenty-one to the custody of the director of the Rhode Island Training School for Youth. Additionally, a recalculation of restitution was made,[3] and thereafter Randy was ordered to pay back $18,185 out of any assets owned by him and out of earnings derived from his work at the school. Near the end of the hearing, Randy's attorney asked whether Randy could be released sooner if restitution could be made right away. The trial justice replied that he would consider this request. During the following weeks, several motions were filed pursuant to which two more hearings were held. The hearings involved efforts on the part of Randy's parents to obtain the necessary restitution money to secure the release of their son. Deposit of the funds ordered for restitution was then made into the Registry of Court to be held pending appeal of this case to this court; in the interim, Randy was placed on probation.

In reviewing the conduct of the Family Court justice, we note at the outset that we do not agree with the arguments of Randy's attorney that the Family Court justice committed error in finding Randy delinquent. This court has consistently held that the findings of fact made by a trial justice sitting without a jury will be accorded great weight. Moreover, such findings will not be disturbed on appeal unless it is shown that the trial justice misconceived or overlooked relevant evidence or was otherwise clearly wrong. *Proffitt v. Ricci*, R.I., 463 A.2d 514, 517 (1983) (see citations collected therein); *In re Susan*, 122 R.I. 677, 682–83, 411 A.2d 296, 299 (1980). The same reasoning ap-

plies with equal force to inferences drawn by a trial justice sitting as a trier of fact. *Walton v. Baird*, R.I., 433 A.2d 963, 964 (1981); *Lisi v. Marra*, R.I., 424 A.2d 1052, 1055 (1981); *Tanzi v. Fiberglass Swimming Pools, Inc.*, R.I., 414 A.2d 484, 487 (1980).

In the instant case, the trial justice drew inferences of guilt from the fact that Randy was identified by Doe as the person to whom eight checks on as many occasions representing thousands of dollars had been paid over in exchange for minor house repairs. Randy was further identified by a bank teller and her supervisor as the individual to whom a $3,000 cashier's check had been drawn after the check had first been purchased by Doe. Clearly, the trial justice drew a reasonable inference when he concluded that Randy's signature on the back of the check, coupled with his assertions that he did not know what he was signing, tended to destroy Randy's credibility as a witness and to point persuasively toward guilt. In the case at bar, we are wholly unpersuaded, under the principles enunciated above, by the claim that the evidence adduced at trial was insufficient to establish Randy's guilt beyond a reasonable doubt. *See Robidoux v. Pelletier*, 120 R.I. 425, 435–36, 391 A.2d 1150, 1155 (1978).

The next claim by Randy's attorney is that the Family Court justice erred in calculating the total amount of money that had been produced as the result of the checks that Doe had drawn. Specifically, counsel notes that the justice was in error in totaling nine, instead of eight, checks whose proceeds the justice found to have been fraudulently obtained by Randy.[4] On

---

3. The trial justice was in error in his recalculation. *See infra* note 4 and accompanying text.

4. The relevant checks that Doe drew from March 17 to April 7, 1983, total $15,470. They were as follows:
   Check # 213, $500 (dated March 17, 1983).
   Check # 215, $500 (dated March 18, 1983).
   Check # 218, $900 (dated March 23, 1983).
   Check # 219, $2,670 (dated March 24, 1983).
   Check # 221, $3,000 (dated March 25, 1983). (The proceeds of check # 221 were used to purchase a cashier's check of the same amount on the same date).
   Unnumbered teller's check, $2,300 (dated March 31, 1983).
   Check # 226, $3,100 (dated April 6, 1983).
   Check # 227, $2,500 (dated April 7, 1983).
   Relying on the testimony at trial, the Family Court justice excluded as not relevant to this

this issue we agree with counsel who points out that one of the nine checks was a $3,000 cashier's check that had been purchased on the same day at the bank by Doe with one of her own personal checks. Since Doe's personal check was used to purchase the cashier's check, one, but not both, of those instruments should have been calculated by the trial justice as part of the total amount expended by Doe. Accordingly, we take this opportunity to correct the trial justice's inadvertent miscalculation of restitution and hold that the proper amount owed, based on the sum of the eight relevant checks drawn by Doe, is $15,470.

■ The last of the substantive claims by Randy's counsel in this appeal is that the trial justice applied the wrong law and incorrectly ordered the payment of restitution in conjunction with committing Randy to the Rhode Island Training School for Youth. Counsel claims that relying on the facts presented at trial, the trial justice was obliged to proceed under the applicable provisions of § 14–1–32.1.[5] That section, counsel contends, requires first that a juvenile be placed on probation before payment of any restitution can be ordered. The trial justice in the instant case committed Randy

to the Rhode Island Training School after finding him delinquent. Randy was then further ordered to pay restitution from any funds he would derive by working at the school. Counsel's argument is that the trial justice ordered the payment of restitution while impermissibly acting under the authority and dictates of § 14–1–32,[6] rather than that of § 14–1–32.1. Counsel contends that the trial justice may invoke the provisions of § 14–1–32 only when a juvenile, after having come before the justice, has been found to have committed "property damage." Asserting that obtaining money by false pretenses does not amount to "property damage," counsel claims that any action by the trial justice pursuant to § 14–1–32 was thereby inappropriate.

We do not agree with counsel's interpretation of §§ 14–1–32 and 14–1–32.1. Nor do we agree with the narrow construction that we have been asked to place on the term "damage to * * * property" as found in § 14–1–32.

In analyzing these two sections, we note that § 14–1–32 provides a broad grant of authority to a justice of the Family Court to determine the proper disposition of a child who comes before the court. The

case other checks drawn by Doe during the period under consideration.

5. In pertinent part G.L.1956 (1981 Reenactment) § 14–1–32.1, as amended by P.L.1982, ch. 220, § 1, provides that:

"If a judge of the family court finds that a child is delinquent, wayward or otherwise within the provisions of this chapter, and places said child on probation, he shall where appropriate require the child to compensate the victim of said child for losses due to the act of the child, and the child shall make such restitution in a reasonable amount within a reasonable period of time established by the judge from funds earned by the child pursuant to employment engaged in by the child."

6. Section 14–1–32, as amended by P.L.1983, ch. 251, § 1, provides that:

"If the court shall find that a child is delinquent, wayward, neglected, dependent or otherwise within the provisions of this chapter, it may by order duly entered proceed as follows:

"Place the child on probation or under supervision in his own home or in the custody of a relative or other suitable person, or in the

custody of any of the agencies, societies or institutions under the control of or approved by the department for children and their families, upon such terms as the court shall determine; provided, however, *that if the court shall find that a child is delinquent or wayward for any offense which has resulted in damage to the property of another, then in that event the court may order that appropriate monetary restitution be made forthwith to the owner of said damaged property by said child, his or her parent, parents or guardian or other lawful custodian upon examination and after a finding that said child or his or her parent, parents or guardian or other lawful custodian has the ability to pay said restitution.*

"Provided, further, that the court may order the parent or parent(s) of said child to undertake a program of counselling which program shall be designed to attempt to remedy those conditions which led to the child's coming before the court." (Emphasis added.)

language of § 14–1–32 is expansive, and the options available to a family court justice are broad. A child may be placed on probation *or* supervised in his own home *or* placed in the custody of an agency, institution, or department "upon such terms as the court shall determine." Section 14–1–32. Under such language, the trial justice in the instant case was well within his statutory authority when he ordered restitution after committing this child to the training school.

We are not persuaded by counsel's claim that the proviso of § 14–1–32 precludes that section's application in the instant case. The proviso states that

"if the court shall find that a child is delinquent or wayward for any offense which has resulted in damage to the property of another, then in that event the court may order that appropriate monetary restitution be made forthwith to [its] owner * * *."

Counsel would have us interpret § 14–1–32 to apply only when a juvenile comes before the court as a result of his having committed physical damage to property. Such a reading places undue emphasis on the alleged restrictive intent of the restitution proviso and also contravenes the Legislature's clear intent in this instance to provide broad authority to the justices of the Family Court.

▆ We note that one of the prime purposes of the restitution proviso of § 14–1–32 is to provide that the Family Court justice should inquire whether a delinquent youth has caused monetary loss or damage to another person; if so, then the Family Court justice is authorized to order restitution. Because this portion of § 14–1–32 is clearly remedial in nature and was drafted undeniably for the benefit of victims who may be injured as a result of a delinquent juvenile's lawless conduct, any interpretation of the phrase "damage to * * * property" must be read in light of these circumstances. "Damage to * * * property" in the context of § 14–1–32 cannot be construed so as to limit its applica-

tion to the commission by a juvenile of physical damage to tangible property. Rather, damage to property here must be interpreted to include any deprivation, loss, or impairment of the use of one's property, whether by physical destruction, theft, or otherwise. *See Pritsker v. Greenwood*, 47 R.I. 384, 386, 133 A. 656, 657 (1926) (liberal construction of statute held to include "any damage" caused by defendant's dog); *Larisa v. Tiffany*, 42 R.I. 148, 158–59, 105 A. 739, 743 (1919) (remedial statute construing damage to property to include husband's loss of wife's services). In the case at bar, we are of the opinion that the trial justice was correct in determining that obtaining property by false pretenses fell within the restitution proviso. Accordingly, we hold that the trial justice in the case at bar acted within the power accorded him under § 14–1–32 to commit the delinquent youth to the Rhode Island Training School, and in addition to order further that the juvenile make restitution from his assets and earnings at the school.

Finally, we observe that there is no merit to the claim by Randy's attorney that the dictates of § 14–1–32.1 were contravened by the trial justice in this case. As we noted earlier, we do not accept counsel's argument that under the facts of this case restitution could not be ordered pursuant to § 14–1–32 and thereby necessitate acting under § 14–1–32.1. In pertinent part, § 14–1–32.1 states that

"[i]f a judge of the family court finds that a child is delinquent * * * and places said child on probation, he shall where appropriate require the child to compensate [his] victim * * *."

▆ Counsel urges that this language compels placing a juvenile on probation before restitution may be ordered. We believe, however, that § 14–1–32.1 must be read in conjunction with § 14–1–32 and thus interpreted within the context of the entire statutory framework under which the two statutes were drafted. It seems apparent that § 14–1–32.1 was enacted by the Legislature with the intent to provide

the Family Court with one more tool to deal effectively with delinquent juveniles. Acting under the premise that the Family Court is a court of special statutory jurisdiction, the Legislature understandably desired that the Family Court be provided with specific authority to carry out its objectives. A prime purpose of § 14-1-32.1, therefore, was to provide the Family Court with the specific authority necessary to enable it to require the payment of restitution as a condition of probation. Thus, if a juvenile should fail to comply with a restitution order, then this could be considered a violation of probation for which sanctions including incarceration might be imposed. Section 14-1-32.1 should not be read so as to require that a juvenile must be placed on probation before he can be ordered to pay any restitution. Rather, § 14-1-32.1 should be understood as a legislative directive under which a justice of the Family Court is authorized and exhorted to consider an order of restitution in the event that he places a juvenile on probation for delinquent conduct.

We deem it appropriate to state at this point that we have dealt with the issues raised by Randy's counsel in respect to the order of restitution on their merits. However, we note that the deposit of moneys in the Registry of Court by Randy's parents was done voluntarily and not pursuant to any order directed toward them by the court. It might be argued that such a deposit constituted a voluntary act on the part of his parents, thus rendering moot issues relating to an order directed to Randy. In any event, we have not chosen to adopt this alternative rationale for decision.

For the foregoing reasons, the adjudication of the Family Court in respect to the finding of delinquency is affirmed. The order in respect to restitution is modified to provide that such restitution shall be in the amount of $15,470. In all other respects the order of restitution is affirmed. The papers in the case may be remanded to the Family Court for entry of a restitution order consistent with this opinion.