**Augusta P. FINKELSTEIN**

v.

**Elliot FINKELSTEIN, et al.**

**No. 82–455–Appeal.**

Supreme Court of Rhode Island.

Dec. 19, 1985.

Harry W. Asquith, Edward W. Moses, Asquith, Merolla, Anderson, Ryan & Wiley, Providence, for plaintiff.

Seth Bowerman, A. Lauriston Parks, Hanson, Curran & Parks, Max Wistow, Wistow, Barylick & Bruzzi, Inc., Martin M. Temkin, Temkin & Miller, Ltd., Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case is before us on appeal from a judgment entered in the Superior Court. The plaintiff brought suit against the defendants seeking relief for alleged breaches of trust. The matter was tried without a jury and resulted in judgments for the defendants. Thereafter, the plaintiff filed a motion for a new trial, which motion was denied. We affirm. The facts as found by the trial justice, insofar as they are relevant to this appeal, are as follows.

The Finkelstein family of Woonsocket has owned and operated for many years four corporations in that city. The companies were founded by Jacob Finkelstein and included Jacob Finkelstein & Sons, Inc.; Sports Apparel, Inc.; Samoset Realty Company, Inc.; and Samoset Processing Company. Samoset Realty is the real estate holding company for the other three corporations, which are the operating companies. All stock in the companies was held by the Finkelstein family.

Although Jacob Finkelstein was the founder of the four companies, his sons, Harold, Robert, Noah, and Elliot began operating the businesses in the 1930's and 1940's. The situation which ultimately led to the present lawsuit began with Harold's death in 1969. At that time, the four brothers had an arrangement whereby Harold's estate would, in effect, sell his stock outright to the corporation on a time basis. This arrangement caused acute problems since the buy-out of Harold's stock significantly drained the working capital of the four corporations, which then had greatly reduced liquid assets.

When Harold died, the surviving brothers, Robert, Elliot, and Noah, received about $30,000 in insurance proceeds. They used those insurance proceeds to purchase stock from Harold's estate in order to give the estate some liquidity. Over a period of time, Harold's heirs were paid approximately $300,000 for the stock, the last payment being made in 1980.

In 1969 Robert Finkelstein devised a new estate plan for himself and his brothers in an attempt to avoid repetition of the problems incurred in the administration of Harold's estate. The new plan called for each of the three surviving brothers to establish

identical inter vivos trusts into which their respective estates would be transferred upon their deaths. The plan also called for the creation of a marital deduction trust to provide for the brothers' respective widows and heirs. The remaining stock in the companies would go to the surviving brothers in order to maintain the continuity of the family operation.

A significant aspect of this new estate plan was the creation of 3,000 shares of class A stock in Jacob Finkelstein & Sons, Inc. This stock would pay annual cumulative preferred dividends of $8 per share upon the death of any one brother. These dividends would be available through the marital deduction trust for the use of the deceased brother's widow. Jacob Finkelstein & Sons, Inc., was reorganized, and each brother was issued 1,000 shares of class A stock, thereby guaranteeing each widow $8,000 annually. In addition, the brothers owned a total of 6,000 shares of common stock in Jacob Finkelstein & Sons, 2½ shares of common stock in Samoset Realty, and 25 shares of common stock in both Samoset Processing Company and Sports Apparel Corporation. Under this new estate plan devised by Robert, these shares became class B common stock.

The subject matter of this litigation is a trust executed by Robert Finkelstein on November 25, 1969, as amended June 4, 1970, and March 13, 1971 (hereinafter sometimes referred to as the trust or basic trust). In accordance with the new estate plan, Robert transferred all stock in the four corporations and all debt instruments of these corporations held by him to the trust. Out of this disposition there would be an allocation to the marital deduction trust to take advantage of all the federal estate-tax benefits and Rhode Island inheritance-tax benefits to be derived from transfers to a spouse. The trust document provided that the class A stock would go into the marital deduction trust. There then would be an allocation made of the other assets, including the class B common stock, to the marital deduction *trust* equal to the

amount that was allowed as a marital deduction under the federal estate tax. The remaining assets were to go to a residuary trust that would ultimately be used for the benefit of the surviving brothers. The purpose of such an elaborate estate plan was to keep control of the Finkelstein companies in the Finkelstein brothers without the necessity of a large expenditure of money to buy out a deceased brother's interest.

Robert Finkelstein died on August 4, 1971. In accordance with his will, the assets in his estate—that is, assets not already in the trust—poured over into the trust. Robert had made provisions during his lifetime for his children and had made disposition of other property by gift so that his estate at death was relatively small. The trust, however, was valued at nearly $500,000 and consisted almost entirely of stock and debt instruments of the four corporations.

Following Robert's death, the plaintiff, Augusta Finkelstein (Augusta), began making inquiries into her husband's estate and the various trusts. The trial justice found as a fact that although Augusta attempted to give the court the impression that she knew little about the estate plan, she was actually well aware of the estate plan crafted and implemented by her husband. The trial justice further determined from the evidence presented before him that Augusta had not been satisfied with her husband's plan from its inception and had actually wanted the surviving brothers to buy her out, essentially in the same way that Harold's heirs had been bought out.

Robert had created an insurance trust for Augusta in which there were proceeds of $207,000. On the advice of the family lawyer, she revoked the trust shortly after Robert's death and withdrew the corpus. The defendants, Elliot and Noah Finkelstein (Elliot and Noah), also each received $50,000 in insurance proceeds from a group insurance policy on Robert, which they loaned to the corporations as working capital.

In May 1972 the federal estate and Rhode Island inheritance taxes became due. The trust provided that the residuary trust would bear the expenses of administration of the estate and the payment of taxes. It was immediately apparent that Robert's estate and trust lacked the liquidity to pay these taxes. A suggestion was made that Elliot and Noah buy $100,000 worth of shares from the trust in order to create the funds necessary to pay the taxes and administration expenses. Although Elliot and Noah were under no obligation to consent to such an arrangement, they agreed to use the money from insurance proceeds that they had loaned the corporations to purchase $100,000 worth of residuary trust stock. The transaction was completed on May 3, 1972. The proceeds of the purchase were used to pay taxes and expenses of administration. The trial justice determined that Augusta was carefully advised of the purpose and method of this transaction by the family's attorney.

The federal tax return, as filed, was subsequently audited by the Internal Revenue Service and found to be correct. The Finkelsteins' attorney completed the audit and received a closing letter from the Internal Revenue Service in March 1974. Among other things, the valuation of Robert's stock as set forth in the estate-tax return was accepted.

The next important piece of business was the allocation of the assets of the basic trust to the marital trust and residuary trust and the closing of the estate. The stock allocation to the marital trust had to have a value of $287,000 in satisfaction of the marital deduction taken on the estate tax return. In November 1974 the family's attorney, assisted by the accounting firm of Carl Christiansen & Company, proposed an allocation and communicated it to Noah, Elliot, and Augusta. Noah and Elliot responded that they were in general agreement with the overall allocation plan. Augusta, however, still persisted in her demand that Noah and Elliot buy out the stock to be allocated to the marital trust.

Finally, in late 1974 Augusta indicated that she intended to secure the services of an attorney and that all future contacts with her should be through her attorney. The trial justice found that Augusta refused to attend a meeting of the trustees to consummate the allocation and her attorney "became very combative on that point" and "refused to cooperate in any way."

The allocation was finally accomplished in 1980, despite repeated attempts by Augusta and her attorney to prevent its completion. However, the 1980 allocation was based entirely on the 1974 figures and values. Any adjustments made were simply technical in nature in order to reflect the value of property that was transferred from the estate of Robert Finkelstein. Ultimately, 1,000 shares of class A common stock of Jacob Finkelstein & Sons, Inc. went into the marital trust, as dictated by the trust's provisions. In addition, 121 shares of class B common stock of Jacob Finkelstein & Sons, Inc. went into the marital trust along with 14½ shares each of Samoset Processing and Sports Apparel, and 1½ shares of Samoset Realty. The value of those shares, at Robert's death, for estate tax purposes, was $278,000. Those shares were essentially the only assets of the marital deduction trust as of the time of trial.

I

In support of her appeal, Augusta contends that the trial justice erred in denying her relief as the beneficiary of a marital trust and asserts that the controlling trustees have breached their fiduciary duties. In support of this contention, Augusta advances several arguments that can best be resolved by discussing each separately in light of the trial justice's pertinent findings.

■ Augusta initially asserts that the trial justice erred in ruling that she was not entitled to receive from defendants annual accountings regarding the administration of the trust. Relying on the evidence set forth before the court, the trial justice de-

termined that despite the explicit language of the trust instrument, defendants' failure to render an annual accounting was de minimis and actually "redound[ed] to the benefit of the plaintiff." We find that the trial justice was justified in ruling that the Robert Finkelstein trust did not require an annual accounting. The only income from the trust was derived from the class A stock that had been paying Augusta $8,000 per year. Noah and Elliot agreed that Augusta would be paid directly from the corporation. The only other trust assets are nonliquid, nonincome-producing, nonmarketable shares. Furthermore, Augusta received periodic financial reports from the various companies and was therefore aware of their respective financial conditions. If Noah and Elliot were forced to comply with the annual accounting provision, expenses would be incurred for the labor of accountants and lawyers. This would have resulted in a reduction of the $8,000 being paid directly to Augusta.

A careful consideration of the evidence supports the trial justice's finding that the failure of Noah and Elliot to render an annual accounting of the trust assets was a de minimis breach, actually operating in Augusta's favor and therefore did not rise to the level of a breach of trust adequate to support Augusta's claim.

◼ Augusta also contends that the trial justice erred in holding that she was not denied her rights to participate in the administration of the trust. After considering all the evidence, the trial justice found this allegation "rather incongruous in view of the events that have taken place and the plaintiff's obstructionistic tactics in refusing to attend meetings and refusing to even discuss the allocation and in refusing to cooperate with the other two trustees."

The trial justice further noted the complete lack of evidence that defendants had prevented Augusta from participating in the management of the trust. To the contrary, the evidence showed that Noah and Elliot had given Augusta notices of all important meetings of the trustees and that she, in fact, steadfastly refused to participate, especially in the meetings concerning the allocation to the marital trust. We conclude that the evidence clearly warranted a finding by the trial justice that Augusta was not denied the right to participate in the management of the trust property.

Augusta also alleges that the trial justice erred in finding that the allocation of stock to the marital trust was fair and reasonable. Augusta presented the head of the trust department of a local bank as an expert witness. This witness was not familiar with the method of stock allocation in this case, nor was he asked to study the stocks and companies involved. Rather, the trust officer was asked to make some general observations. His first observation was that the trust provides for an allocation based on values as of the date of allocation. The second observation was that income-producing stock should be allocated first to the marital deduction trust.

The trial justice agreed with the expert's two observations but noted that such observations failed to indicate that defendants engaged in any wrongful conduct. In support of this finding, the trial justice determined that the allocation was essentially made as of 1974, although not carried out on paper until 1980. In 1974 the allocation was based on the federal estate-tax accepted values that were the book values as of the date of Robert's death.

◼ A basic maxim of equity provides that equity regards as done that which ought to have been done. *Carpenter v. The Providence Washington Insurance Co.*, 45 U.S. (4 How.) 184, 223, 11 L.Ed. 931, 948 (1846); *Alix v. Alix,* — R.I. —, —, 497 A.2d 18, 22 (1985). *See generally* McClintock, *Handbook of the Principles of Equity* § 24 at 52 (2d ed. 1948). Applied to this case, it means the allocation should have taken place in 1974, after the IRS closing letter. The mere fact that the actual paper work was done in 1980 is irrelevant, and therefore, the trial justice properly found that the allocation was fairly

based on 1974 values, as required by the imperatives of the Internal Revenue statutes.

Augusta next alleges that the trial justice erred in finding that she, as cotrustee, had not been denied access to the trust books, records, memoranda, agreements and bank statements. The trial justice dismissed this allegation, relying on the evidence that Augusta had, in fact, been given all the documents she had ever requested. He further noted the complete lack of evidence that Augusta had ever been denied access to any information by either Noah or Elliot.

■ Next, Augusta assigns as error the trial justice's finding that Noah and Elliot did not breach a fiduciary duty by purchasing stock from the residuary trust. The trial justice found this count difficult to understand "unless counsel had a very distorted view of what happened." The trial justice found as a fact that Noah and Elliot used their own money to buy $100,000 worth of stock that would have been part of the residuary trust. He found that the purpose of the purchase was to discharge Augusta's obligation to pay the estate and inheritance taxes and administration expenses of Robert's estate. This was done without cost to Augusta. We agree with the trial justice that "[t]here is no evidence in this case that the defendants did anything wrong * * * or that the plaintiff did not receive [the benefit of] this money."

■ Finally, Augusta argues that the trial justice erred in finding that Noah and Elliot had no duty to distribute the principal to her or to liquidate the corporations. The trial justice carefully reviewed the Robert Finkelstein Trust instrument, which directed the trustees to pay Augusta the income from the marital trust not less than quarter-annually. The trust instrument further provides that the trustees may, in their sole discretion, distribute principal to Augusta after determining what is necessary for her comfort, maintenance, and well-being.

The trial justice found as a fact that there was no cash in the marital trust other than the dividends created by the class A stock. This finding led him to ask the rhetorical question, "What were the defendants to do with this situation?" Essentially, what Augusta desired was for Noah and Elliot to buy her out or liquidate the corporations. The trial justice correctly held that they did not have a fiduciary obligation to take either action, especially in light of overwhelming evidence on the record that clearly established that it was not Robert's intent that the corporations be liquidated.

II

■ It is a well-settled rule that the findings of a trial justice will not be disturbed unless it is demonstrated that he was clearly wrong or that he has misconceived relevant evidence. *Dickinson v. Killheffer,* — R.I. —, —, 497 A.2d 307, 312 (1985); *Joni Auto Rentals, Inc. v. Weir Auto Sales, Inc.,* — R.I. —, —, 491 A.2d 328, 330 (1985); *Proffitt v. Ricci,* — R.I. —, —, 463 A.2d 514, 517 (1983); *Berube v. Montgomery,* — R.I. —, 463 A.2d 158, 161 (1983); *Altieri v. Dolan,* — R.I. —, —, 423 A.2d 482, 484 (1980); *Taffinder v. Thomas,* 119 R.I. 545, 549, 381 A.2d 519, 521 (1977); *see* 1 Kent, *R.I.Civ.Prac.* § 52.5 at 384 (1969). More significantly, in relation to the case at bar, the same principle applies to the inferences and conclusions drawn by a trial justice in respect to ultimate issues of fact derived from the testimony and evidence. *Casey v. Casey,* — R.I. —, —, 494 A.2d 80, 82 (1985); *In re Randy B.,* — R.I. —, 486 A.2d 1071, 1073 (1985).

We have carefully reviewed the record of evidence put before the trial justice as well as the findings of fact and conclusions of law rendered in the trial court's written decision. We are convinced on the basis of this review that the inferences and conclusions drawn by the trial justice were supported by substantial evidence. In each instance we have referred to Augusta's

claims of error and the evidence relied upon by the trial justice in his findings of fact and conclusions based thereon. Therefore, we decline to disturb these findings and conclusions.

### III

 Following the entry of judgment, Augusta filed a motion for new trial that was denied. Augusta now assigns as error that denial by the trial justice. The grounds for a motion for new trial are extremely limited, and such motion is appropriate only in instances in which either the trial court may find a manifest error of law on the face of the judgment previously entered or there is newly discovered evidence, not previously known or discoverable in the exercise of reasonable diligence, that is of sufficient importance to warrant a new trial of the action. *See, e.g., Town of Glocester v. Lucy Corp.,* —— R.I. ——, 422 A.2d 918 (1980); *Corrado v. Providence Redevelopment Agency,* 117 R.I. 647, 370 A.2d 226, *cert. denied,* 434 U.S. 807, 98 S.Ct. 37, 54 L.Ed.2d 64 (1977); *Corrado v. Providence Redevelopment Agency,* 110 R.I. 549, 294 A.2d 387 (1972); *Colvin v. Goldenberg,* 108 R.I. 198, 273 A.2d 663 (1971).

In the case at bar, this motion served no purpose except to exhort the trial justice to correct his own alleged errors of law. This he had no authority to do. The motion for new trial did not contain a colorably adequate foundation upon which to base an argument that it should be granted. The motion, in effect, was a mere nullity and was properly denied. *Tillson v. Feingold,* —— R.I. ——, ——, 490 A.2d 64, 66 (1985); *Town of Glocester,* —— R.I. at ——, 422 A.2d at 919.

For the reasons stated, the plaintiff's appeal is denied and dismissed. The judgment of the Superior Court is hereby affirmed. The papers in the case may be remanded to the Superior Court.

BEVILACQUA, C.J., did not participate.