Robert Rulon MILLER,

v.

DIXON INDUSTRIES
CORPORATION et al.

No. 83–463–Appeal.

Supreme Court of Rhode Island.

July 21, 1986.

Joseph V. Cavanagh, Lawrence P. McCarthy, Higgins Cavanagh & Cooney, Providence, for plaintiff.

Michael P. DeFanti, Hinckley Allen Tobin & Silverstein, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from a judgment entered in the Superior Court. The trial justice, sitting without a jury, awarded damages to the plaintiff as a result of Dixon Corporation's breach of an employment contract. Both parties appeal. We affirm in part and reverse in part. The facts, insofar as pertinent to this appeal, are as follows.

The plaintiff, Robert Rulon Miller (Miller), bought Dixon Lubricating Saddle Company from his wife's family in the early 1950s. Following this purchase, Miller became president of the company and changed its name to Dixon Corporation. Under Miller's direction, the Dixon Corporation was very successful, and a plan was devised whereby the corporation was reorganized into a holding company, Dixon Industries Corporation (DIC), and several wholly owned operating subsidiaries, including Dixon Corporation and Penntube

Plastics. Under this new reorganization plan, DIC held the stock in the various operating subsidiaries.

Over the years, various shares of DIC were transferred outside the Miller family as a result of acquisitions and stock-option plans. However, until 1973, Miller owned or at least controlled approximately 60 percent of DIC stock.

In late 1971 Bundy Corporation (Bundy), through its president, Wendell Anderson, Jr. (Anderson), and vice president, William E. Eckhardt (Eckhardt), expressed to Miller an interest regarding Bundy's possible acquisition of all the assets of DIC. Although Miller was reluctant to sell the company, he agreed to let Bundy's representatives examine the corporate books in exchange for a sum of money that was paid by Bundy to DIC. Anderson thereafter suggested a purchase price, and Miller, negotiating on behalf of himself as 60 percent shareholder and on behalf of the company as chairman of the board, suggested a figure of $7.5 million. Anderson agreed that Bundy would meet the $7.5 million selling price. Essential to the consummation of this transaction, however, was Miller's desire to enter into an employment contract that would survive the transfer of DIC's assets to Bundy. Bundy agreed to retain Miller following the changeover, and an employment agreement was negotiated between the parties, the terms of which provided that for eight years Miller would not work or hold any interest in any business that competed with Dixon Corporation or did similar work; that he be available to work for Dixon Corporation for the contract term; and that he refrain from divulging any trade secrets of Dixon Corporation or its subsidiaries. In exchange, Miller was to receive a $25,000 annual salary and continuation of certain fringe benefits that were also being offered to other company executives. Both parties agreed to the provisions of the proposed employment agreement, and documents were prepared in anticipation of concluding the transaction on October 1, 1973.

In mid-July 1973, Miller, through his attorney, forwarded a copy of the proposed employment agreement to Anderson. However, in late July of that year, Miller reconsidered the proposal and determined that the $7.5 million selling price was too low. He thereafter informed Bundy that all negotiations for the purchase of DIC were terminated.

The following August, Miller again reconsidered Bundy's offer to purchase DIC and informed Anderson that he would be willing to sell DIC for $8.5 million. Bundy agreed to meet the $8.5 million selling price, and a new closing date was scheduled for December 1, 1973. The employment agreement was executed in the exact terms as that prepared for the October 1, 1973 closing date. Specifically, the December 1, 1973 employment agreement between Miller and Dixon Corporation, provided in pertinent part:

"1. Dixon hereby employs the Employee, and the Employee hereby agrees to serve Dixon, in an executive capacity, for a period (hereinafter called the 'Employment Period') commencing on the date hereof and ending on November 30, 1978 or upon the earlier termination of this Agreement as herein provided. The Employee's duties during the Employment Period shall be such executive and managerial duties as the Board of Directors of Dixon shall from time to time prescribe. The Employee shall serve as such executive officer as the Board of Directors of the Corporation shall designate.

"2. While employed hereunder and for a period of three years after the termination of his employment, the Employee shall not, directly or indirectly, be interested in any business competing with or similar in nature to the business of Dixon or any of its divisions, subsidiaries or affiliates.

"3. Dixon, as consideration for Employee's services and for the covenants and agreements on Employee's part shall pay to Employee a salary of Twenty-five Thousand Dollars ($25,000) per annum payable in substantially equal monthly installments. Employee shall also participate in such vacation rights and expense reimbursements as Dixon may from time to time provide with respect to its employees performing similar functions.

"4. During the Employment Period Dixon shall continue all of the benefits Employee enjoyed by virtue of his employment with Dixon Corporation at the time the assets of Dixon Industries Corporation were acquired by Bundy Corporation, including without limitation the Pension Plan for Employees of Dixon Corporation in Bristol, Rhode Island, and Westboro, Massachusetts, the Deferred Compensation Agreement between Dixon and Employees dated September 12, 1962, the Group Investment Plan for Salaried Employees of Dixon in Bristol, Rhode Island and Westboro, Massachusetts, Blue Cross-Blue Shield and other medical insurance, and group life and disability insurance, except that Dixon shall not provide the use of a car nor continue the life insurance on the life of Employee. In the event Dixon provides additional fringe benefits or improves the terms of existing benefits for any of its other executives during the Employment Period, Employee shall be entitled to elect to have such additional benefits or such improved provisions apply to him.

\* \* \* \* \* \*

"8. Employee shall keep confidential all information concerning the business and affairs of Dixon and its subsidiaries, whether acquired as a result of Employee's employment by Dixon or otherwise, and he shall at no time, either during or after his employment, directly or indirectly disclose any such information to any person, firm or corporation except in pursuance of Dixon's business."

The sale of DIC's assets to Bundy was effectuated on November 30, 1973, at which time DIC was dissolved, and Dixon Corporation remained the operating compa-

ny,[1] with Bundy as the controlling corporation. The employment agreement between the new Dixon Corporation (hereinafter referred to as Dixon), as a Bundy subsidiary, and Miller was executed on the same date in conjunction with the sale and was signed on behalf of Dixon by its president, Saul Ricklin (Ricklin). Following the execution of the employment agreement, Miller became employed by Dixon, the new operating company, in an executive capacity.

For a period commencing in October 1974 and extending through 1977, Dixon through its controlling corporation, Bundy, made stock options available to certain managerial employees, including Ricklin, Dixon's president. Under that stock-option plan, Ricklin could elect to buy 1,000 shares of Bundy stock at $9 per share, but he could not exercise that option before October 16, 1976. Other similar provisions granted Ricklin options to purchase additional shares of Bundy stock at prices varying between $6 and $10 per share and exercisable at various set dates over the next few years. Throughout the duration of Ricklin's options, the market value of the Bundy shares was in excess of the option price.

Over the same period, Dixon was also providing cash-bonus programs to many of its executives. However, from 1973 through 1977 neither Bundy nor Dixon advised Miller that these stock-option plans and various other cash-bonus plans were being provided to Ricklin or any other Dixon executive. Miller, relying on paragraph 4 of the employment agreement, notified Bundy of his belief that he also was entitled to the stock option plans and cash-bonus programs being offered to the other employees. Miller was advised by Eckhardt, through a letter dated October 26, 1978, that Bundy did not regard him as qualifying for the stock-option plans or cash-bonus programs being offered to the other employees. As a result, Miller commenced action against Bundy and Dixon in the Superior Court, seeking damages for breach of contract.

The trial justice determined that the dispute between Miller and Bundy involved two issues: "(1) Were the cash bonuses made available by Dixon and Bundy to Dixon executives over the five year term of plaintiff's employment contract additional fringe benefits as that phrase is used in paragraph 4 of the employment contract dated December 1, 1973 between the plaintiff and Dixon-Bundy? (2) Are the stock options made available to Saul Ricklin in 1976, '77 and '78 of Bundy stock by Dixon-Bundy additional fringe benefits as contained in the agreement?"

The trial justice determined that there can only be two categories of compensation—salary and fringe benefits. He held that the cash bonuses were not "additional fringe benefits" as contemplated in paragraph 4 of the employment contract. However, he held that the stock-option plans were an "additional fringe benefit" and that Bundy and Dixon breached the contract by not offering those option plans to Miller.

The trial justice awarded plaintiff $24,-257.75 in damages, representing the difference between the value of the shares on the dates the options could have been exercised and the price of the options when granted. Further, the trial justice determined that 12 percent interest would be added to the judgment and that such interest would be computed from the date the options were exercisable and not from the dates the various options should have been made available to Miller.

Finally, the trial justice found that Ricklin, although ostensibly employed by Dixon,

---

**1.** On the first day of trial, the trial justice granted plaintiff's motion to substitute as defendant the Dixon Corporation for the named defendant, Dixon Industries Corporation (DIC). Apparently DIC, at the time the employment contract was made, was the sole stockholder of all Dixon Corporation stock. When Bundy purchased all of the assets of DIC, DIC was thereafter dissolved. At the time of the sale to Bundy the president of Dixon Corporation was Saul Ricklin.

executed the employment contract on behalf of Bundy's interest. As a result of that transaction, the trial justice deemed it appropriate to pierce the corporate veil, thereby holding Bundy and Dixon jointly and severally liable for the damage award.

Four issues are raised in the instant appeal. Further facts will be supplied as necessary to consider the issues presented.

Bundy and Dixon assign as error the trial justice's finding that the term "additional fringe benefits," as contemplated in paragraph 4 of the employment agreement, included stock-option plans. They argue that the term "additional fringe benefits" is ambiguous and that any ambiguity in the terms of a contract must be construed against the drafter. Further, Bundy and Dixon contend that even if the stock options are to be considered fringe benefits, Miller was not entitled to them because the stock options were not benefits enumerated in the employment contract nor were they new or additional benefits.

It is well established that where ambiguity exists in a contract provision, the construction of that provision is a question of fact. *Judd Realty, Inc. v. Tedesco*, 400 A.2d 952, 955 (R.I.1979); *Fryzel v. Domestic Credit Corp.*, 120 R.I. 92, 98, 385 A.2d 663, 666 (1978); *Russolino v. A.F. Rotelli & Sons, Inc.*, 85 R.I. 160, 163, 128 A.2d 337, 340 (1957). Further, unless plain and unambiguous intent to the contrary is expressed, contract terms are assigned their plain and ordinary meaning. *Westinghouse Broadcasting Co., v. Dial Media, Inc.*, 122 R.I. 571, 581, 410 A.2d 986, 991–92 (1980).

The trial justice determined that the term "additional fringe benefits" was indeed ambiguous and therefore susceptible of interpretation. Citing "the absence of any discussions or memos between the parties during negotiations concerning any special meaning attached to [the words "additional fringe benefits"]," the trial justice accorded the words their ordinary meaning. He found that the term "additional," as used within the written employment agreement, could mean either any benefits being of-

fered *in addition to* those specifically enumerated in the agreement or any other benefits offered to Dixon executives *subsequent to* the date of the agreement. Applying this analysis to the facts, the trial justice first noted that at the time of sale of DIC's assets to Bundy, no stock-option plan was being offered to any DIC employee. Bundy put the stock-option plan into effect in 1974, but the plan was not exercisable until 1976. Despite Bundy's insistence that such stock-option plan was not a fringe benefit, the trial justice determined that since the stock-option plan most certainly was not salary, it had to be considered a fringe benefit. Accordingly, the trial justice found that under either definition of the term "additional fringe benefit," the stock-option plan that was available to Ricklin during the five-year term of Miller's employment agreement had to be considered an "additional fringe benefit" to which Miller was entitled. The trial justice concluded that Dixon's and Bundy's failure to make the stock-option plan available to Miller was a breach of the employment agreement.

■■■ It is a well-settled rule that the findings of a trial justice sitting without a jury are accorded great deference and will not be disturbed unless it is demonstrated that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *Dickinson v. Killheffer*, 497 A.2d 307, 312 (R.I.1985); *Joni Auto Rentals, Inc. v. Weir Auto Sales, Inc.*, 491 A.2d 328, 330 (R.I.1985); *Lisi v. Marra*, 424 A.2d 1052, 1055 (R.I.1981). Moreover, in relation to the case at bar, the same principle applies to the inferences and conclusions drawn by a trial justice in respect to ultimate issues of fact derived from the testimony and evidence. *Finkelstein v. Finkelstein*, 502 A.2d 350, 355 (R.I.1985); *Casey v. Casey*, 494 A.2d 80, 82 (R.I.1985).

We have carefully reviewed the evidence put before the trial justice as well as the findings of fact and conclusions of law rendered in the trial justice's decision. We are convinced on the basis of this review

that the inferences and conclusions drawn by the trial justice were supported by substantial evidence. Consequently, we are of the opinion that the trial justice did not err in determining that the stock-option benefits were additional fringe benefits under the terms of the employment contract.

Although Miller agrees with the finding of the trial justice that the stock-option plan was an additional fringe benefit, he argues on appeal that the trial justice erred in determining that interest on the damage award was computable from the dates on which the stock options were exercisable rather than from the dates on which the stock options were granted. Miller contends that the employment contract was breached on the date that Bundy and Dixon failed to extend to him the stock options granted to Ricklin. Accordingly, for purposes of applying the interest-on-judgment statute,[2] Miller asserts that interest on the judgment should have been measured from the grant date since that was the date on which his cause of action accrued.

At trial, Miller argued that the court should have assumed that he would have exercised any stock options granted to him on the first exercisable date and that he would have kept the stock right up until the trial date, thereby entitling him to the difference between the option price and the present fair market value. The trial justice determined, and we believe rightly so, that such assumptions were sheer speculation in light of the lack of evidence that Miller would have purchased the shares and held on to them. However, the trial justice did recognize that "any reasonable person being accorded a stock option, seeing that the option price is lower than the market value, would have exercised the option and sold the shares immediately and made a quick profit." Accordingly, the trial justice found that Miller's damages from the breach of contract were equal to the difference between the option price of the shares and the fair market value of the shares on the dates that the options were first exercisable. If Miller had been given the opportunity to exercise the options that had been available to Ricklin, he would have had the opportunity to earn a profit of $24,257.75.[3]

We believe that the trial justice's findings regarding the accrual of Miller's cause of action was amply supported by the record. We agree that any computation of lost profits beyond the analysis applied by the trial justice would have been sheer speculation. Absent a showing that the trial justice was clearly wrong or miscon-

2. General Laws 1956 (1969 Reenactment) § 9–21–10, as amended by P.L.1981, ch. 54, § 1, provides in part:

"Interest in Civil action.—In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages, interest at the rate of twelve per cent (12%) per annum thereon *from the date the cause of action accrued* which shall be included in the judgment entered therein." (Emphasis added.)

3. The trial justice used the following calculations to determine Miller's lost profits:

| DATE OF OPTION | DATE OPTION EXERCISABLE | NUMBER OF SHARES | MARKET PRICE PER SHARE ON DATE FIRST EXERCISABLE | ACQUISITION PRICE PER SHARE | OPTION MARKET DIFFERENCE | POTENTIAL PROFIT ON EXERCISE DATE |
|---|---|---|---|---|---|---|
| 10/16/74* | 10/16/76 | 1000 | $14.75 | $ 9.00 | $5.75 | $ 5,750.00 |
| 10/16/74 | 10/16/77 | 1500 | $12.00 | $ 6.00 | $6.00 | $ 9,000.00 |
| 12/8/75 | 12/8/77 | 1350 | $12.12½ | $ 8.00 | $4.12½ | $ 5,568.75 |
| 10/21/76 | 10/21/78 | 1313 | $13.00 | $10.00 | $3.00 | $ 3,939.00 |
| | | | | | | $24,257.75 |

* The October 16, 1974 option was for 2,000 shares, 50 percent exercisable after two years and 50 percent exercisable after three years. The option exercisable after 3 years benefited from a 50 percent stock split, thereby increasing the number of option shares to 1,500.

ceived relevant evidence, we shall not disturb his findings. *Dickinson, supra.* Thus, for purposes of applying the interest-on-judgment statute, Miller's claim was properly determined to have accrued on the dates on which he first could have exercised the stock options.

█ The plaintiff also asserts as error the finding by the trial justice that the cash-bonus program being offered by Dixon was not a fringe benefit as contemplated by paragraph 4 of the employment contract. The trial justice stated that there are only two methods of compensating employees—salary and fringe benefits. In characterizing the cash bonuses as salary, the trial justice defined cash bonuses as "money given to an employee for whatever reason—for an outstanding performance in the past, for incentive purposes for the future, as an adjunct and as an additional salary."

The trial justice relied on findings that prior to the takeover by Bundy, DIC and Dixon Corporation provided certain benefits to its executives and other employees. One of these benefits was an executive-bonus plan that existed for four executives of Dixon Corporation, including Ricklin. A management-bonus plan also existed for other employees. Prior to the takeover, Miller had not been involved in any cash-bonus plan operated by the Dixon Corporation. Following the takeover, the new Dixon Corporation provided, through Bundy, the controlling corporation, cash-bonus plans to many of its executives. The trial justice also relied on testimony that the formula for computing the cash bonuses that were offered to new Dixon Corporation executives was based on the performance of the new Dixon Corporation and on the salary scale of the particular employee involved, ultimately arriving at a bonus figure that represented a percentage of the particular employee's salary.

The trial justice further noted that prior to the buy out by Bundy, Dixon Corporation considered its executive cash-bonus programs to be a form of fringe benefit.

However, the trial justice found it "totally unreasonable to believe that [Dixon] would have agreed to give plaintiff cash bonuses merely because they were rewarding other employees with cash bonuses." Accordingly, the trial justice held that the bonus plans were not fringe benefits as the term was utilized in the employment agreement and that further, even if the bonuses were fringe benefits, they were not "additional fringe benefits."

We have reviewed the testimony adduced at trial as well as the trial justice's findings of facts and conclusions based thereon. It is our opinion that the trial justice misconceived material evidence in determining that the cash-bonus program was additional salary. We believe that the cash bonuses, although based in part on an employee's salary, were compensation *above and beyond* the regular salary paid by Dixon Corporation. Relying on the trial justice's determination that only two forms of employee compensation exist—salary and fringe benefits, the reasonable conclusion would be that any compensation paid *above and beyond* salary would put the recipient in an improved financial position. Accordingly, any such benefit paid over and above a contractual salary agreement most properly should be characterized as a fringe benefit.

The trial justice acknowledged that even if the cash bonuses were a fringe benefit, Miller still would not be entitled to receive them since the cash bonuses were not an "additional fringe benefit" as contemplated by paragraph 4 of the employment agreement. Referring to the cash bonuses, the trial justice stated that it seemed they were "not in the category of additional fringe benefits because those fringe benefits, if they are so denominated, were in existence before the changeover and Bundy simply continued that program in effect."

We believe the trial justice erred in his determination that the cash-bonus programs did not qualify as an "additional fringe benefit." The trial justice found that the very terms of paragraph 4 of the

employment agreement, when assigned their "plain and ordinary meaning," clearly indicate that Dixon was under an obligation to continue to provide Miller with all of the benefits he was enjoying at the time of the takeover. Furthermore, the agreement specified that in the event Dixon "provides additional fringe benefits * * * for any of its other executive * * * [Miller] shall be entitled to elect to have such additional benefits * * * apply to him." It may be true that in the event "additional" might be construed to mean "new," the cash-bonus program would not qualify as an "additional fringe benefit" since the bonus program was already in effect at the time of the changeover. However, we believe such a conclusion is erroneous in light of the plain language of the employment agreement. "Additional" in the context of paragraph 4 simply means fringe benefits in addition to those already being enjoyed by Miller. Since other Dixon executives were being offered fringe benefits in addition to those being enjoyed by Miller during the term of his five-year employment agreement, those additional fringe benefits, in the form of cash-bonus plans, should also have been offered to Miller.

Consequently, we believe that the trial justice misconstrued the terms of the employment agreement in determining that the cash bonus plans did not qualify as "additional fringe benefits." For the reasons stated above, we hold that the Dixon Corporation breached its part of the employment agreement by not offering such bonus plans to Miller.

Finally, Bundy alleges that the trial justice erred in finding Bundy and Dixon jointly and severally liable for damages from the breach of the employment contract. Specifically, Bundy asserts that the trial justice lacked an evidentiary basis for piercing the corporate veil.

The trial justice found that Miller negotiated with Bundy's representatives regarding the terms of the employment contract. Although conceding that the employment contract was signed by Ricklin, as presi-dent of Dixon Corporation, the trial justice found that it was Bundy's officers who negotiated the agreement and that Bundy controlled the Dixon Corporation following the purchase.

 The standards for piercing the corporate veil vary with the circumstances. Generally, where a parent-subsidiary relationship is involved, it must be demonstrated that the parent dominated the finances, policies, and practices of the subsidiary. *Parrillo v. Giroux Co.*, 426 A.2d 1313, 1321 (R.I.1981). The mere fact that there exists a parent-subsidiary relationship between the two corporations is insufficient reason to impose liability on the parent for the torts of the subsidiary. *Id.* A similar principle should be applied to liability for breach of contract. In fact, courts faced with a similar issue in other jurisdictions have been less likely to ignore corporate forms in contract cases where the plaintiff has made a knowing and deliberate choice in dealing with a particular entity. *See, e.g., Miles v. American Telephone & Telegraph Co.*, 703 F.2d 193 (5th Cir.1983); *Hickman v. Rawls*, 638 S.W.2d 100 (Tex.Ct.App. 1982); 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.85 at 460 (perm. ed. 1983). Absent a showing of inequity, fraud, undercapitalization, or domination by the parent corporation, separate corporate identities must be observed. *Alterio v. Biltomore Construction Corp.*, 119 R.I. 307, 377 A.2d 237 (1977); *see also* 10 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 4878 at 364 (perm. ed. 1978).

 We believe it was error for the trial justice to elect to pierce the corporate veil. A careful review of the record discloses no evidence that Bundy perpetrated fraud or acted inequitably in negotiating the employment contract. It is undisputed that Bundy representatives were involved in the negotiating process. However, Bundy's involvement in the contract negotiations would seem to be an ordinary consequence of its impending purchase of the Dixon Corporation.

Further, there is a complete lack of evidence on the record that Bundy, in order to deprive Miller of stock options, manipulated the benefit programs of the Dixon Corporation to that end, especially in light of evidence that there had never been any assignment of the employment contact by DIC to Bundy. Bundy, in effect, was simply the owner of Dixon Corporation, and Bundy had never entered into any employment contract with Miller. Moreover, Dixon, at the time of its purchase by Bundy and thereafter, was a profitable corporation with assets for which Bundy was willing to pay $8.5 million. There is nothing on the record to suggest that Bundy and Dixon are anything other than distinct and adequately capitalized incorporated financial units. Accordingly, Dixon has been, and in fact remains, fully able financially to fulfill its own contractual obligations. Any contract entered into between Miller and Dixon can only be binding upon Dixon.

There is simply no evidence in the record that indicates that Bundy completely dominated the Dixon Corporation to the point where Dixon lost its separate identity.

For the reasons stated, the judgment of the Superior Court is affirmed in part and reversed in part. The papers in the case are remanded to the Superior Court for further proceedings in accordance with this opinion.

Chief Justice Bevilacqua participated in the oral argument and in the decision of the court but retired prior to the publication of this opinion.