STOP & SHOP SUPERMARKET COMPANY, and Walgreen Eastern Co., Inc., Plaintiffs,

v.

BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, Coordinated Health Partners, Inc. d/b/a Bluechip, CVS Corporation, Thomas E. Morrison, Maxi Drug, Inc. d/b/a Brooks Pharmacy, C. Daniel Haron, Pharmacare Management Services, Inc., Greg S. Weishar, Provider Health Services, Inc., Ronald Bochner, and United Healthcare of New England, Inc., Defendants.

C.A. No. 99–282–T.

United States District Court, D. Rhode Island.

Jan. 10, 2003.

William M. Dolan, III, Brown, Rudnick, Berlack, Israels, LLP, Providence, RI, J. Mark Gidley, Robert D. Paul, Gregg A. Hand, Peter J. Carney, White & Case LLP, Washington, DC, for Plaintiff.

Steven E. Snow, Partridge, Snow & Hahn LLP, James Ruggieri, John T. Walsh, Jr., Higgins, Cavanagh & Cooney, Robert C. Corrente, Christopher R. Bush, Hinckley, Allen & Snyder, R. Kelly Sheridan, Jr., Roberts, Carroll, Feldstein & Peirce, Inc., Providence, RI, Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., David T. Shapiro, Thomas G. Krattenmaker, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Barbara H. Ryland, Arthur N. Lerner, Crowell & Moring, LLP, Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

TORRES, Chief Judge.

Stop and Shop Supermarket Company ("Stop & Shop") and Walgreen Eastern Co., Inc. ("Walgreens") brought this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 3 of the Clayton Act, 15 U.S.C. § 14; and sections 4 and 6 of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-4, -6. The plaintiffs claim that the defendants have restrained trade and limited competition in the Rhode Island market for the sale of prescription pharmaceuticals covered by health insurance plans and that they have tortiously interfered with the plaintiffs' business relationships by creating a "closed network" of pharmacies at which plan subscribers are required to fill their prescriptions in order to obtain maximum reimbursement.

The claims against United Healthcare of New England, Inc. ("UHC"), Provider Health Services, Inc. ("PHS"), Maxi–Drug, Inc., d/b/a Brooks Pharmacy ("Brooks"), C. Daniel Haron and Ronald Bochner have been dismissed pursuant to the terms of a settlement agreement allowing the plaintiffs' pharmacies to join the network that serves UHC and is managed by PHS. The remaining defendants have filed two summary judgment motions, one by Blue Cross and Blue Shield of Rhode Island and Coordinated Health Partners, Inc., d/b/a Blue Chip (collectively referred to as "Blue Cross") and one by CVS Corporation ("CVS"), PharmaCare Management Services, Inc. ("PharmaCare"), Thomas E. Morrison and Greg Weishar.

Because this Court finds that the exclusive dealing arrangement at issue is not a *per se* violation of the antitrust laws and does not tortiously interfere with the plaintiffs' business relationships; and, because this Court further finds that there are disputed factual issues that must be resolved in order to determine whether the arrangement unreasonably restrains trade, the motions for summary judgment are granted in part and denied in part.

### Facts

The record reveals the undisputed facts to be as follows. Blue Cross and UHC offer a variety of health insurance and HMO plans that pay the major portion of the cost of prescription pharmaceuticals obtained by their subscribers. Approxi-

mately 60% of Rhode Islanders covered by such plans are Blue Cross customers. An additional 25% are UHC customers.

Until 1997, Blue Cross had a mostly "open" pharmacy system in which subscribers could purchase prescription drugs at any pharmacy. Blue Cross also self managed the pharmacy benefits programs under its plans. Thus, Blue Cross, itself, determined what pharmaceuticals were covered; negotiated with individual pharmacies to establish the prices for pharmaceuticals purchased pursuant to the plans; and processed claims by subscribers.

In the fall of 1997, Blue Cross decided to hire a pharmacy benefits manager ("PBM") to administer the pharmacy benefits programs under its plans. Typically, a PBM establishes a "closed network" of participating pharmacies that agree to discount the prices that they charge for prescription pharmaceuticals purchased pursuant to a particular insurer's health insurance plans. The network pharmacies further agree not to join any other PBM network that competes with the PBM for that insurer's business. Pharmacies are induced to join such a network by the expectation that they will receive a greater volume of business because the insurer whose plans are administered by the PBM provides plan subscribers with an incentive to patronize network pharmacies by offering more generous reimbursement for pharmaceuticals purchased at those pharmacies than for pharmaceuticals purchased at non-network pharmacies and because the PBM agrees to limit the number of pharmacies in its network.

In September 1997, Blue Cross sent out a request for proposals and received competing bids from three PBM's: PharmaCare, PCS and WellPoint. PCS's bid was rejected because PCS was unwilling to share in the risk that the program would lose money.

PharmaCare, a subsidiary of CVS, proposed a closed network consisting of all of the CVS pharmacies and most of the independent pharmacies in Rhode Island. CVS's fifty-two pharmacies in Rhode Island account for roughly forty-one percent of the third-party reimbursed purchases of prescription drugs in the state.

WellPoint proposed a closed network consisting of pharmacies operated by plaintiffs Stop & Shop and Walgreens. Stop & Shop operates eighteen pharmacies and Walgreens operates fifteen pharmacies in Rhode Island.

WellPoint's bid was lower than PharmaCare's but Blue Cross expressed some dissatisfaction with both bids and gave the two PBMs an opportunity to submit modified bids. In December 1997, after receiving the modified bids, Blue Cross decided to select PharmaCare as its PBM but no agreement was signed at that time. The plaintiffs allege that WellPoint's bid was superior to PharmaCare's and that PharmaCare was selected for unspecified ulterior motives.

At the time that Blue Cross selected PharmaCare, UHC already had a "closed" network consisting primarily of Brooks pharmacies and managed by PHS (the "UHC/PHS network"). Brooks is the second largest retail pharmacy chain in Rhode Island with forty-two retail outlets and approximately nineteen percent of Rhode Island's third-party reimbursed pharmaceutical sales.

Blue Cross's selection of PharmaCare came on the heels of discussions among representatives of UHC, PHS and CVS about expanding the UHC/PHS network and including CVS in it. During those discussions, UHC officials told PHS officials that UHC wanted to include more pharmacies in the UHC/PHS network. Stop & Shop, Walgreens, and CVS all ex-

pressed an interest in joining the network, but Ronald Bochner, PHS's president, rejected the overtures by Stop & Shop and Walgreens.

In January 1998, Thomas Morrison, CVS's vice president of pharmacy services, contacted Bochner, and the two men discussed CVS's interest in joining the UHC/PHS network. Around that same time, Greg Weishar, the president of PharmaCare, wrote to Bochner offering to admit the PHS pharmacies into the Blue Cross/PharmaCare network if CVS was admitted into the UHC/PHS network. Weishar, also, rebuffed requests by Stop & Shop and Walgreens to join the Blue Cross/PharmaCare network.

On February 19, 1998, PHS agreed to allow CVS to join the UHC/PHS network. However, negotiations between PharmaCare, PHS and Brooks continued and it was not until May 18, 1998, that contracts were executed between PharmaCare and PHS and between PharmaCare and Brooks allowing Brooks and the other PHS pharmacies to join the Blue Cross/PharmaCare network. Those contracts prohibited Brooks and PHS's other member pharmacies from participating in other networks competing for Blue Cross's business and they prohibited PharmaCare from admitting into the Blue Cross/PharmaCare network pharmacies other than the existing members of that network and the members of the PHS network. Blue Cross ultimately approved admission of the PHS pharmacies into the Blue Cross/PharmaCare network pursuant to a provision in the agreement between Blue Cross and PharmaCare requiring that such approval be obtained.

On November 19, 1998, Blue Cross and PharmaCare executed the agreement making PharmaCare Blue Cross's PBM for a period of three years beginning on January 1, 1999.

Blue Cross plans create a financial incentive for subscribers to patronize network pharmacies by providing subscribers with a higher level of reimbursement for prescription pharmaceuticals purchased at network pharmacies than for those purchased at non-network pharmacies. However, from the facts presented thus far, it is impossible to determine the precise nature or extent of that incentive. Blue Cross offers an array of plans in which the methods of reimbursement for the purchase of prescription pharmaceutical products vary greatly and the parties have failed to explain the relevant provisions of those plans or the differences, if any, in the amounts that subscribers are required to pay for prescription pharmaceuticals at network pharmacies as opposed to non-network pharmacies.

The plaintiffs have presented evidence that, since the establishment of Blue Cross's closed network, their sales of prescription pharmaceuticals to Blue Cross subscribers have declined; they have been forced to curtail plans to expand; the retail price of prescription pharmaceuticals at network pharmacies has increased and the level of services provided to consumers has been reduced.

### The Plaintiffs' Claims

Count I of the amended complaint alleges that the defendants conspired to unreasonably restrain trade in violation of § 1 of the Sherman Act by excluding the plaintiffs from competing in the Rhode Island market for the retail sale of prescription pharmaceutical products that are reimbursed by insurance.[1]

---

1. Count I also alleges that the defendants "conspired ... to allocate markets and to

artificially raise, fix, maintain or stabilize pharmaceutical reimbursement rates and co-

Count II alleges that the defendants established an exclusive dealing arrangement that violates § 3 of the Clayton Act and § 1 of the Sherman Act because it reduces competition and tends to create a monopoly for the defendants in the Rhode Island market for the retail sale of prescription pharmaceutical products that are reimbursed by insurance.

Count III alleges that the conduct that is the subject of the claims in Counts I and II also violates the Rhode Island Antitrust Act.

Count IV alleges that, by excluding the plaintiffs from their network, the defendants intentionally interfered with the business relationships between the plaintiffs and their present and future pharmacy customers.

As already noted, the plaintiffs have settled their claims against the UHC and PHS defendants; and, pursuant to the terms of that settlement agreement, they have been allowed to join the UHC/PHS network.

### *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it directly relates to the legal elements of a claim or defense to an extent that could

affect the outcome of the case. *Id.* In deciding whether a genuine issue of material fact exists, the Court views the evidence in the light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir.1991).

When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis of the motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant, then, has the burden of demonstrating the existence of a genuine issue of material fact requiring a trial. *Dow v. United Bhd. of Carpenters and Joiners of Am.*, 1 F.3d 56, 58 (1st Cir.1993). More specifically, the nonmovant is required to establish that it has sufficient evidence to enable a jury to find in its favor. *See DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997).

### *Analysis*

#### I. *The Anti–Trust Claims*

The gravamen of the plaintiffs' antitrust claims is that the combined Blue Cross/PharmaCare and UHC/PHS network creates an exclusive dealing arrangement that violates the antitrust laws.

An exclusive dealing arrangement is one in which a buyer agrees to purchase all or a significant portion of its requirements of a product or service solely from a particular seller or sellers. William C. Holmes,

---

payment levels, resulting in higher prices for prescription pharmaceutical products ... restraint of competition among providers ... and an unlawful increase in market power by

Defendants'' but those allegations are neither explained in the plaintiffs' memoranda nor supported by any proffered evidence. Am. Compl. ¶ 72.

Antitrust Law Handbook § 2:23, at 352 (2001) (the "Antitrust Handbook").

Here, it appears that Blue Cross provides incentives for its subscribers to patronize network pharmacies by providing greater reimbursement for prescription pharmaceuticals purchased from network pharmacies than for those purchased at non-network pharmacies. In exchange, network pharmacies have agreed not to join any competing network and to discount the price of prescription pharmaceuticals sold to Blue Cross and its subscribers. At this juncture, it is difficult to determine whether such an arrangement amounts to an exclusive dealing agreement because, as already noted, the exact nature and extent of the differing reimbursements provided by Blue Cross are unknown.

Moreover, the plaintiffs' claim that the arrangement runs afoul of the antitrust laws is undermined by the fact that the plaintiffs, themselves, were part of Well-Point's network that unsuccessfully sought a similar arrangement with Blue Cross and by the fact that one of the conditions of the agreement settling the plaintiffs' claims against UHC and PHS was that the plaintiffs be permitted to join the UHC/PHS network.

### A. The Relevant Statutes

Both Section 1 of the Sherman Act and Section 3 of the Clayton Act are aimed at activities that interfere with competitive markets and their ability to provide adequate supplies of quality goods at reasonable prices. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The objective of those statutes is the "protection of competition, not competitors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

Section 1 of the Sherman Act seeks to accomplish that objective by prohibiting concerted action that unreasonably restrains trade. It provides:

> Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

Section 3 of the Clayton Act prohibits selling a commodity on the condition that the purchaser refrain from dealing with the seller's competitors. It provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods ... or other commodities ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

Exclusive dealing arrangements that involve commodities may be challenged under either statute but those that involve a service or something other than a commodity may be challenged only under Section 1 of the Sherman Act. Antitrust Handbook § 5:3, at 528–29.

The provisions of the Rhode Island Antitrust Act mirror those of §§ 1–2 of the Sherman Act and § 3 of the Clayton Act and are construed in the same manner as

the federal statutes.[2] *Greater Providence MRI Ltd. P'ship v. Medical Imaging Network of Southern New England, Inc.*, 32 F.Supp.2d 491, 493 (D.R.I.1998); *ERI Max Entm't, Inc. v. Streisand*, 690 A.2d 1351, 1353 n. 1 (R.I.1997) (Rhode Island General Laws § 6–36–2(b) requires state antitrust law to be "construed in harmony with judicial interpretations of comparable federal antitrust statutes").

## B. *The Sherman Act Claim*

■ In order to prevail on their Sherman Act claim, the plaintiffs must establish that:

(1) The defendants participated in a conspiracy or some other form of concerted activity;

(2) The conspiracy or concerted activity unreasonably restrained trade; and,

(3) The restraint affected interstate commerce.

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 632–33 (9th Cir.1987); *see also DM Research v. College of Am. Pathologists*, 2 F.Supp.2d 226, 228 (D.R.I.1998).

The plaintiffs also must demonstrate an injury of a type that the antitrust laws were intended to prevent (i.e., an "antitrust injury"); a causal relationship between the violation and the resulting injury and standing to assert the claim. Antitrust Handbook § 2:2, at 151.

### 1. *Concerted Action*

The defendants' participation in a conspiracy or some other form of concerted action may be proven either by direct evidence or by circumstantial evidence. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). However, circumstan-tial evidence, alone, will not support a finding of conspiracy if that evidence is equally consistent with a finding that the defendants did not conspire. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Circumstantial evidence of concerted action may include proof of consciously parallel behavior, but parallel behavior, by itself, is not sufficient to distinguish concerted action from independent acts that, coincidentally, are similar. That is especially true when the alleged conduct is consistent with a legitimate business purpose. Antitrust Handbook § 2:4, at 153–56. Accordingly, additional evidence is required to establish "plus" factors that "tend to exclude the possibility that the defendants acted independently." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1232 (3rd Cir.1993).

The principal "plus" factors are:

(1) That the defendants had a motive and an opportunity to conspire; and

(2) That the defendants acted contrary to their economic self-interest so that their conduct cannot be explained on legitimate business grounds.

*Id.* at 1242.

Proof of these plus factors may include evidence of meetings attended by the defendants followed shortly thereafter by parallel behavior that goes beyond what would be expected absent an agreement. It also may include evidence that the defendants acted contrary to their self-interest. Antitrust Handbook §§ 2:6, at 174–75.

Here, there is evidence that the defendants engaged in parallel behavior by con-

---

**2.** The only material difference between R.I. Gen. Laws § 6–36–6 and § 3 of the Clayton Act is that § 6–36–6 applies to agreements for the sale of services as well as commodities.

temporaneously expanding the Blue Cross/ PharmaCare and the UHC/PHS networks to include the same pharmacies and to exclude the plaintiffs. There also is evidence that the expansion was preceded by a series of meetings, telephone calls, and correspondence in which representatives of PharmaCare, CVS, PHS, and Brooks discussed the possibility of admitting CVS into the UHC/PHS network; admitting Brooks and the PHS pharmacies into the Blue Cross/PharmaCare network and establishing a uniform reimbursement plan. Furthermore, there is evidence that the admission of Brooks into the Blue Cross/PharmaCare network was contingent upon the admission of CVS into the UHC/PHS network and vice versa. In addition, there is evidence that Blue Cross was aware of those discussions and that its approval was necessary to allow Brooks into the Blue Cross/PharmaCare network. Finally, there is evidence that the decisions to admit CVS into the UHC/PHS network and Brooks into the Blue Cross/PharmaCare network were made shortly after those discussions and within a few months of each other.

That evidence is sufficient to support an inference that the defendants engaged in concerted action to expand the two networks, but it sheds no light on whether the purpose or effect of that action was to unreasonably restrain trade in connection with the retail sale of prescription pharmaceutical products.

### 2. Unreasonable Restraint

Not all concerted action that, in some way, restrains trade is illegal. Courts have recognized that some business combinations or agreements that adversely affect a particular competitor may have pro-competitive effects that outweigh their anti-competitive effects. *See, e.g., Standard Oil Co. of California v. United States*, 337 U.S. 293, 306–307, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (describing the potential pro-competitive virtues of exclusive dealing arrangements). Therefore, the Sherman Act focuses on the *net* effect of a challenged practice and prohibits only conduct that *unreasonably* restrains trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Since the antitrust laws were enacted for the "protection of competition, not competitors," a restraint is not deemed unreasonable unless it harms competition. *Brown Shoe Co.*, 370 U.S. at 320, 82 S.Ct. 1502.

The plaintiffs' assertion that the "mutual expansion" of the two networks was designed to lessen competition between Blue Cross and UHC is neither plausible nor supported by any evidence. If anything, it appears more likely that the expansion increased competition between Blue Cross and UHC because it permitted their potential customers to choose between the insurers based on a comparison of the plans that they offered rather than on a preference for doing business with a particular pharmacy.

Nor is it rational to infer that Blue Cross agreed to expand the two networks in order to lessen competition among pharmacies selling prescription pharmaceuticals. The rationale for a closed network is that limiting the number of pharmacies enables the insurer to negotiate lower prices for the prescription pharmaceuticals that it purchases by holding out the prospect that network pharmacies will receive a larger volume of business from the insurer's subscribers. Increasing the number of network pharmacies decreases the volume of business that each pharmacy is likely to get; and, therefore, diminishes the pharmacies' incentive to discount the prices charged to the insurer and its subscribers.

The plaintiffs' failure to explain how the expansion of the two networks lessened competition between Blue Cross and UHC or why Blue Cross would want to lessen competition among pharmacies lends credence to the evidence presented by Blue Cross that its purpose was to accommodate the desire of CVS to gain access to the PHS network. In any event, while motive is a relevant consideration in determining whether concerted actions violate the Sherman Act, the ultimate question is whether the challenged conduct unreasonably restrains trade. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir.1993) ("Motive can ... be a guide to expected effects, but effects are still the central concern of the antitrust laws, and motive is mainly a clue.").

Some restraints may be deemed unreasonable *per se* and some may be found unreasonable under the "rule of reason." *See Khan*, 522 U.S. at 10, 118 S.Ct. 275. Here, the plaintiffs claim the defendants' exclusive dealing arrangement is unlawful under either method of analysis.

### 3. *The Alleged Per Se Violation*

Restraints that are inherently anti-competitive because they have a " 'pernicious effect on competition and lack any redeeming virtue' " are deemed unreasonable *per se*. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (quoting *Northern Pacific*, 356 U.S. at 5, 78 S.Ct. 514). In order to be classified as a *per se* violation, a restraint must be one that a court can "predict with confidence" will be condemned by the "rule of reason." *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

In the case of a *per se* violation, the plaintiff is not required to prove an *actual* anti-competitive effect. Nor is the plaintiff required to prove the defendants' market power or any other indicia that the challenged conduct is *likely* to harm competition. Rather, anti-competitive effects are presumed. *U.S. Healthcare*, 986 F.2d at 593.

Because the *per se* rule condemns conduct without inquiring into market conditions or the actual impact of the conduct on competition, the *per se* rule is applied sparingly and only where the adverse impact on competition is obvious and substantial. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15–16, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Drug Emporium, Inc. v. Blue Cross of Western New York, Inc.*, 104 F.Supp.2d 184, 188 (W.D.N.Y.2000). Thus, the designation of *per se* violation generally is limited to agreements to fix prices, limit production, and engage in certain types of group boycotts. *U.S. Healthcare*, 986 F.2d at 593; *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir.1998) (citations omitted).

The plaintiffs concede that some exclusive dealing arrangements do not run afoul of the antitrust laws but they assert that the one at issue in this case is unlawful *per se* because it is a "horizontal agreement[ ] among competitors to eliminate competition" from the market for third-party reimbursed prescription drugs that amounts to a "group boycott." Pls.' Mem. in Opp'n to CVS's Mot. for Summ. J. at 10. This Court rejects that argument for several reasons.

First, the challenged arrangement is neither a horizontal agreement among competitors nor a group boycott. A horizontal agreement is an agreement between firms occupying the same level of the market structure. *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). A "group boycott" exists where "competitors

agree with each other not to deal with a supplier or distributor if it continues to serve a competitor whom they seek to injure." *U.S. Healthcare,* 986 F.2d at 593. Here, Blue Cross, PharmaCare, CVS and their counterparts in the UHC/PHS network occupy different levels of the market for third-party reimbursed prescription drugs. Blue Cross and UHC, in effect, are buyers; CVS and Brooks are sellers; and PharmaCare and PHS administer the prescription benefits programs of the two insurers and negotiate the prices to be paid by the insurers to participating pharmacies. Thus, any agreement between the insurers and/or the PBMs, on the one hand, and the pharmacies, on the other hand, is not a group boycott. Rather, it is more akin to an arrangement under which a distributor agrees to deal exclusively with one manufacturer which has been described as a vertical arrangement that does not constitute a *per se* violation of the antitrust laws. *Id.* at 594. Nor is there even an allegation that the network pharmacies with which the plaintiffs compete for the sale of third-party reimbursed prescription drugs, have agreed among themselves not to deal with Blue Cross or UHC if the insurers do business with the plaintiffs.

Second, it is not "obvious" that the plaintiffs have been excluded from the relevant market. Even assuming, *arguendo,* that the relevant market is the market for third-party reimbursed prescription drugs, it is far from clear that expansion of the PharmaCare and PHS networks has precluded the plaintiffs or any other pharmacies from competing in that market. The exclusion claim rests on the premise that the challenged arrangement prevents Blue Cross and UHC subscribers from purchasing prescription drugs from non-network pharmacies. However, there is no evidence that subscribers are prohibited from patronizing non-network pharmacies. There is some evidence that subscribers may receive higher levels of reimbursement for prescription pharmaceuticals purchased at network pharmacies than for those purchased at non-network pharmacies. Nevertheless, from the facts presented, it is impossible to determine precisely what financial incentives those differences may create for subscribers to patronize network pharmacies, or whether such incentives impair the plaintiffs' ability to compete for subscribers' business by lowering their prices to the levels charged by network pharmacies. In any event, it appears that the plaintiffs and other non-network pharmacies can compete for the business of Blue Cross and its subscribers every three years when the exclusive dealing agreements expire.

Third, to the extent that Blue Cross and UHC subscribers are deterred from patronizing non-network pharmacies because their plans might require them to pay less for prescription pharmaceuticals at network pharmacies, the reduction in price may be a redeeming virtue that makes *per se* treatment inappropriate.

Fourth, it is difficult to see how expansion of the two networks has harmed competition or the plaintiffs. If anything, it has increased competition among the network pharmacies by enabling them to vie for the business of *both* Blue Cross and UHC subscribers. Nor can the plaintiffs point to any injury they have sustained as a result of the expansion. On the contrary, prior to the expansion, the plaintiffs were excluded from both the PharmaCare and PHS networks; but since their settlement with PHS, they, now, are excluded only from Blue Cross's portion of the market. Furthermore, expansion of the networks has increased the pharmacy choices available to consumers by making it easier for Blue Cross subscribers to select phar-

macies in the PHS network and for UHC subscribers to select pharmacies in the PharmaCare network.

Finally, courts, generally, have held that exclusive dealing arrangements similar to the one at issue in this case provide potential competitive benefits that make it inappropriate to treat them as *per se* violations of the antitrust laws. *See, e.g., Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.*, 996 F.2d 537, 545 (2d Cir.1993) (rejecting *per se* challenge to exclusive dealing arrangement between an HMO and an independent practice association of member physicians given Supreme Court's reluctance to extend *per se* doctrine and because of recognized pro-competitive virtues of independent practice association forms of HMOs); *Jefferson Parish v. Hyde*, 466 U.S. 2, 26–29, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (exclusive dealing agreement requiring that all anesthesiology services required by a hospital's patients be performed by a particular group of doctors is not a *per se* violations of the Sherman Act); *U.S. Healthcare*, 986 F.2d at 593–97 (exclusive dealing agreement between an HMO and its panel doctors does not constitute a group boycott that would justify treating it as a *per se* violation). Indeed, at least one court has held, specifically, that an exclusive pharmacy network virtually identical to the one in this case did not run afoul of the Sherman Act as a *per se* violation. *Drug Emporium*, 104 F.Supp.2d at 188–190. That court noted the Supreme Court's reluctance "to adopt rules designating 'restraints imposed in the context of business relationships' as *per se* violations 'where the economic impact of certain practices is not immediately obvious.'" *Id.* at 188 (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458–459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)).

The validity of exclusive dealing arrangements, instead has been determined under the "rule of reason" which requires proof of actual or threatened anti-competitive effects in the relevant market. Antitrust Handbook §§ 1:4, at 40–42. Furthermore, such agreements have been held to pass muster even under "rule of reason" analysis absent evidence that the price of the goods in question has increased; the quality has decreased, or the choices available to consumers have been diminished in some way other than preventing them from selecting the plaintiff. *Capital Imaging*, 996 F.2d at 547; *see also U.S. Healthcare*, 986 F.2d at 595–97;.

### 4. *Rule of Reason Analysis*

■ The lawfulness of practices that are not *per se* violations of the antitrust laws is determined by applying the "rule of reason." The test prescribed by the "rule of reason" is "whether, under 'all of the circumstances,' the challenged practice is 'unreasonably restrictive of competitive conditions.'" Antitrust Handbook § 2:10, at 193.

In contrast to cases involving *per se* violations, plaintiffs in cases where the "rule of reason" is applied must prove that the challenged practice causes an antitrust injury. In other words, they must prove that the practice harms competition. *Drug Emporium*, 104 F.Supp.2d at 189. The plaintiffs also must prove that the harm caused by the challenged practice outweighs any beneficial effects on competition. *U.S. Healthcare*, 986 F.2d at 595.

Generally, restraints that are ancillary to legitimate business goals and are not seriously anti-competitive will pass muster under "rule of reason" analysis. *See Tower Air, Inc. v. Federal Express Corp.*, 956 F.Supp. 270, 283 (E.D.N.Y.1996) (ancillary restraints are lawful if they are subordinate to a separate, legitimate transaction

**192**

and they serve to make the transaction more effective).

Antitrust injury may be demonstrated in either of two ways. It may be proven *directly* by presenting evidence of *actual* injury to competition in the relevant market or it may be proven *indirectly* by showing the *likelihood* of serious injury to competition. *Law v. National Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir.1998); *Drug Emporium*, 104 F.Supp.2d at 189.

An *actual* injury to competition may be shown by demonstrating that the challenged practice has increased prices or reduced output. *Law*, 134 F.3d at 1019. A *potential* injury to competition may be shown by presenting evidence that the defendants possess sufficient market power in the relevant market to significantly threaten competition. *Id.;* Antitrust Handbook § 2:10, at 198.

Market power has been defined as the power to raise prices above competitive levels or to exclude competition. *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 966 (10th Cir.1990) (citation omitted). Market share is only one of the factors to be considered in determining whether a particular defendant has market power and there is no talismanic test for ascertaining what share of the relevant market a defendant must have in order to possess sufficient market power to threaten competition. *Id.* at 967.

Since market power is merely a "surrogate" for determining the likelihood of actual injury to competition, it need not be established where proof of actual injury exists. *Indiana Fed'n of Dentists*, 476 U.S. at 460–61, 106 S.Ct. 2009. Moreover, even in cases where market power is relevant, market power, alone, does not establish an antitrust violation. *CDC Technologies, Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 81 (2d Cir.1999) (citations omitted).

Rather, market power has been described as a filter for separating those practices "that pose a sufficient threat to competition to warrant further analysis" from those that do not. Antitrust Handbook § 2:10, at 198. Thus, once market power is proven, the nature, purpose, and duration of the restraint and its effect on competition in the relevant market must be assessed. *Id.; CDC Technologies*, 186 F.3d at 81 (market power, alone, is insufficient; plaintiff also must set forth other grounds to believe that the defendant's behavior will harm competition marketwide); *Greater Providence MRI*, 32 F.Supp.2d at 494 (the "[c]ourt must consider the extent of the foreclosure, the relative strength of the party, the relative value of the commerce at issue, and the buyer's and seller's business justifications for the arrangement") (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)).

When *actual* harm to competition is demonstrated, the issue becomes whether that harm is justified or outweighed by some pro-competitive benefit. *CDC Technologies*, 186 F.3d at 80 n. 4; *see also, National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100–101, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (though agreement had actual anti-competitive effect of fixing prices, the restraint was not unreasonable because without it, competition, itself, would not be possible). If there is no legitimate pro-competitive benefit the challenged practice will be held unlawful. *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir.1993).

■ When *potential* harm to competition is alleged, analysis is a two-step process. The first step is to identify the relevant market which includes both the market for the product or service and the

geographic market. *Levine v. Central Florida Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir.1996). The second step is to assess the effect of the challenged practice on competition in the relevant market and on consumers. *See id.* at 1552–53. Among the factors to be considered in making that assessment are the degree of market power possessed by the defendants, the extent of market foreclosure resulting from the challenged practice; the impact on competitors and competitive justifications for the practice. Antitrust Handbook § 2:23, at 353; *Greater Providence MRI*, 32 F.Supp.2d at 494. Other factors include the duration of the exclusive arrangement and the height of entry barriers. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000).

 Here, there is some evidence that sixty percent of Rhode Island residents covered by health care plans are insured by Blue Cross;[3] that the plaintiffs have curtailed their plans to expand their pharmacy operations; that the retail prices charged at network pharmacies exceed the prices charged at non-network pharmacies[4] and that the level of service provided at network pharmacies has been reduced.

Whether the plaintiffs can prove these things; whether they can prove that these things are attributable to the challenged practice; and whether they can prove that the expanded networks have harmed or threaten to harm competition to a degree that is not outweighed by legitimate business justifications or a reduction in the amount paid for prescription pharmaceuticals by Blue Cross subscribers, are questions that cannot be answered on a motion for summary judgment because those answers turn on the resolution of disputed facts and the subtly nuanced inferences to be drawn from those facts.

## C. The Clayton Act and Rhode Island Anti–Trust Act Claims

The test for determining whether an exclusive dealing arrangement violates the antitrust laws is essentially the same under § 3 of the Clayton Act and under the Rhode Island Anti–Trust Act as it is under § 1 of the Sherman Act, *Greater Providence MRI*, 32 F.Supp.2d at 493, except that § 3 of the Clayton Act applies only to agreements relating to the sale of goods or commodities, *Norte Car Corp. v. First-Bank Corp.*, 25 F.Supp.2d 9, 18 (D.P.R. 1998) (Clayton Act applies to commodities, not services).

 Blue Cross argues that the Clayton Act is inapplicable because its agreement with PharmaCare was an agreement for PharmaCare to provide PBM *services* to Blue Cross and its members. This Court is not persuaded by that argument. The alleged antitrust violation focuses on the plaintiff's exclusion from the defendants' closed pharmacy network; and, consequently, from the market for third-party reimbursed prescription pharmaceuticals. The Blue Cross–PharmaCare agreement was an integral part of that arrangement. Therefore if the plaintiffs are able to prove that the exclusive dealing arrangement violated the antitrust laws, Blue Cross would

---

**3.** It appears that an additional twenty-five percent are insured by UHC, but that statistic is of questionable relevance given the fact that the plaintiffs are no longer excluded from the UHC/PHS network.

**4.** To the extent that the alleged increase in retail prices refers to prices paid by consumers who are not covered by health care plans, it is difficult to see what bearing the alleged price disparity would have on the plaintiffs' claim since the plaintiffs have defined the relevant market as the market for *reimbursed* prescription pharmaceuticals.

not be insulated from liability simply because it did not contract directly with the pharmacies. *See Greater Providence MRI*, 32 F.Supp.2d at 495. Indeed, the Supreme Court has held that, in a network pharmacy arrangement similar to the one in this case, the agreements between health insurers and participating pharmacies are "merely arrangements for the purchase of goods and services by Blue Shield." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 214, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

█ Because the test for determining whether an exclusive dealing arrangement violates the Clayton Act and/or the Rhode Island Anti–Trust Act is the same as the test under the Sherman Act, the analysis is the same. Accordingly, for reasons previously stated, the challenged practice does not constitute a *per se* violation and whether it withstands scrutiny under the rule of reason is a factual question to be determined at trial.

## II. *The Intentional Interference Claim*

█ Under Rhode Island law, in order to prevail on a claim of intentional interference with business relationships, a plaintiff must prove:

1. The existence of a business relationship or expectancy.
2. That the defendants knew of that relationship or expectancy.
3. That the defendants intentionally interfered with that relationship or expectancy.
4. That the interference caused the plaintiff to sustain the harm in question.

*Mesolella v. City of Providence*, 508 A.2d 661, 669 (R.I.1986).

That does not mean that a defendant is liable simply for committing an intentional act that interferes with a plaintiff's business relationships. The interference also must be impermissible or unjustified. *Id.* at 669–670. Otherwise, a defendant would be liable for legitimately competing with a plaintiff for business. *See Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir.2000) (requiring proof that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means). The plaintiff bears the initial burden of showing that the interference was not legally privileged or justified. *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I.2000); *see also Mesolella*, 508 A.2d at 669–70. If that showing is made, the burden shifts to the defendant to prove justification. *Belliveau*, 763 A.2d at 627.

█ Here, the plaintiffs claim that the closed pharmacy network interferes with the relationship or prospective relationship between them as sellers of prescription pharmaceuticals and Blue Cross's subscribers as buyers. That claim rests on the premise that Blue Cross's subscribers are the buyers of reimbursed prescription pharmaceuticals.

However, that premise is inconsistent with the plaintiffs' claim that Blue Cross is liable under the Clayton Act. The Clayton Act applies only to parties to agreements for the "sale of goods." 15 U.S.C. § 14. Since the only *goods* at issue in this case are the prescription pharmaceuticals sold by the various pharmacies, Blue Cross cannot be viewed as a party to an agreement for the sale of *goods* unless it is deemed the buyer of those goods.

Blue Cross also must be viewed as the buyer of the prescription pharmaceuticals obtained by its subscribers because it pays the lion's share of their cost. *Drug Emporium*, 104 F.Supp.2d at 191; *see also Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922, 926 (1st Cir.1984) (Blue

Shield "bought" health care services from physicians for its insureds because it paid a large part of the bill and set the amount of the charge). In fact, as already noted, the Supreme Court has described similar agreements as "merely arrangements" under which the pharmaceuticals are purchased by the health insurer. *Royal Drug*, 440 U.S. at 214, 99 S.Ct. 1067.

### Conclusion

For all of the foregoing reasons, the defendants' motions for summary judgment are granted in part and denied in part as follows:

1. The motions are granted with respect to Counts I—III to the extent that those counts allege *per se* violations. Otherwise, the motions with respect to those counts are denied.

2. The motions are granted with respect to Count IV.