[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court pursuant to Rhode Island Rules of Civil Procedure Rule 56 is Plaintiff Infinite Group, Inc.'s (Infinite) motion for summary judgment as to Defendants Spectra Science Corporation and Nabil Lawandy's (collectively Spectra) counterclaims. Spectra, filed a timely objection thereto and in the alternative, moved to add Laser Fare as a party.
 Facts and Travel
Spectra is a closely held Delaware company that has its principal place of business in Rhode Island. In 1996, Infinite, a publicly traded Delaware corporation with its principal place of business in Rhode Island, acquired a controlling interest in Spectra through the purchase of 2.9 million shares of Series A stock. One of Infinite's designees on the Spectra Board of Directors (Board) was its President and Chief Executive Officer, Clifford Brockmyre (Brockmyre). From 1996 until June 1999, Brockmyre was chairman of the Spectra Board.
In the fall of 1998, Infinite decided to sell all of its Spectra stock. Brockmyer approached Nabil Lawandy (Lawandy), Spectra's President, Chief Executive Officer and member of the Board, about finding a purchaser for Infinite's shares. Lawandy offered to make inquiries of Spectra's other existing shareholders who had a right of first refusal and to possible outside buyers to see if they were interested in such a purchase. With Lawandy's help, arrangements were made for existing and outside investors to buy the stock. By February 26, 1999, Infinite was completely divested of its interest in Spectra. Approximately 80% of Infinite's Spectra stock was sold to other investors for $2.25 per share and approximately 20% was sold to Spectra for $1.26 per share. Some time in March, Spectra resold its newly acquired stock to a third party for $2.25 per share.
Infinite's claim arises from Spectra's resale of the stock. In a letter dated May 19, 1999, Infinite's Director, Michael Smith, notified Spectra and Lawandy that Infinite had become aware of facts indicating that Spectra had made material misrepresentations and non-disclosures in connection with its stock purchase from Infinite. The letter demanded that Spectra reimburse Infinite for its damages totaling $500,000 plus interest within 10 days of receipt of the letter or face a lawsuit. Infinite filed this suit on August 13, 1999. In its complaint, Infinite alleges that Spectra fraudulently induced Infinite to sell its stock to Spectra at a discounted rate by falsely representing that there were no other buyers for the stock and that Spectra would only buy the shares at the reduced price. In doing so, Infinite claims, Spectra breached a fiduciary duty to Infinite.
In response, Spectra denies the allegations and asserts two counterclaims. The first counterclaim is for breach of contract which arises from the sale of four lasers. Spectra alleges that when its scientists tested the lasers to see if they met its specifications, they were found to be nonconforming. Infinite denies that the lasers do not meet Spectra's specifications. Infinite further argues that the claim should be dismissed because Infinite is not a party to the contract. In its memorandum, Infinite asserts that the seller and legal party to the contract is one of its subsidiaries, Laser Fare. Spectra justifies asserting breach of contract in the context of this litigation against Infinite because of its allegation that Brockmyer, who is also President of Laser Fare, held himself out to Lawandy as a representative of Infinite in negotiating the sale of the lasers, and the refund of the laser proceeds to Spectra. Additionally, Spectra asserts that Infinite was directly involved in the laser transaction because it controlled and dominated Laser Fare, its wholly owned subsidiary.
The second counterclaim asserts a breach of fiduciary duty claim and an intentional interference with advantageous relations claim, both of which arise from a single set of facts. Spectra alleges that Infinite intentionally interfered with advantageous relations by filing this suit when it knew that Spectra was in the midst of preparing for an initial public offering (IPO). Brockmyer, in his capacity as Spectra's Chairman of the Board, knew about Spectra's finances and IPO plans. Spectra claims that the suit is unfounded and that it made investment bankers reluctant to back the IPO. As a result of the cloud caused by the lawsuit and market scandals at the time, Spectra withdrew its Registration Statement. Part of the damages it claims is the $3.6 million that was spent preparing for the IPO.
In September, 1999, Infinite filed a motion to dismiss the counterclaims, which was denied with prejudice by the Honorable Patricia Hurst on December 7, 1999. On August 26, 2004, Infinite filed a motion under Rules 12 and 56, arguing that summary judgment should be granted as to the counterclaims.
 Standard of Review
The Rhode Island Supreme Court has articulated the standard that a motion justice must employ in ruling on a summary judgment motion. "Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v. BurrillvilleRacing Association, 603 A.2d 317, 320 (R.I. 1992) (citing Steinberg v.State, 427 A.2d 338 (R.I. 1981); Ludwig v. Kowal, 419 A.2d 297 (R.I. 1980)); Super. Ct. R. Civ. P. 56(c). When the moving party sustains its burden, "[t]he opposing parties will not be allowed to rely upon mere allegations or denials in their pleadings. Rather, by affidavits or otherwise, they have an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." Bourg v. BristolBoat Co., 705 A.2d 969 (R.I. 1998) (citing St. Paul Fire and MarineInsurance Co. v. Russo Brothers, Inc., 641 A.2d 1297, 1299 (R.I. 1994)). During a summary judgment proceeding, "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Palmisciano, 603 A.2d at 320 (citations omitted).
 Breach of Contract Counter Claim
Spectra's first counterclaim alleges breach of contract for the sale of four lasers. According to the pleading, the lasers did not meet specifications and were otherwise faulty. Infinite's primary defense is that it is not a party to the contract. In support of its defense, Infinite submitted documents relating to the sale. These documents, which included an invoice, a contract with a Russian laser supplier and letters from Spectra, indicate that the seller was not Infinite, but a company called Laser Fare. Spectra argues that although the documents say Laser Fare, Infinite is the real defendant to the counterclaim because Brockmyer held himself out to Lawandy as a representative of Infinite when he negotiated the sale of the lasers and the refund of the laser proceeds to Spectra. Additionally, Spectra claims that Infinite was directly involved in the laser transaction because it controlled and dominated Laser Fare, its wholly owned subsidiary.
 No Issues of Material Fact
Summary judgment will only be granted if there is no genuine issue of material fact. O'Connor v. Harry, 359 A.2d 350, 353 (R.I. 1976). The court must consider affidavits and pleadings in the light most favorable to the opposing party. Id. However, "the purpose of summary judgment procedure is issue finding and not issue determination." Id. Upon examination of the evidence filed in support of the legal memoranda submitted by the parties, this Court concludes that there are no issues of material fact concerning whether Infinite was the seller under the contract.
 Infinite Is Not a Party to the Contract
Spectra's first counterclaim arises out of a contractual relationship formed in 1999 for the sale of four lasers. This transaction is governed by the Uniform Commercial Code (U.C.C.) because the contract is for the sale of goods. R.I.G.L. § 6A-2-102. The contract is within the Statute of Frauds because the total value of the contract exceeds $500. The Statute of Frauds is preserved by the U.C.C. in § 6A-2-201, which provides as follows:
 "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against which enforcement is sought. . . ."
This provision leads to two conclusions. The first is that the parties' relationship must be governed by a writing. The second conclusion is that Spectra cannot enforce the contract against a party who did not sign it.
In this case, the order for the lasers was placed over the phone so the invoice for the sale constitutes the contract. This determination is supported by § 6A-2-201(2) which provides as follows:
 "Between merchants, if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of the objection to its contents is given within ten days after it is received."
Evidence submitted by Infinite shows that Spectra placed an order for three[1] lasers to Laser Fare on September 9, 1996, and an invoice to that effect was issued by Laser Fare. Apparently, Spectra did not object to any of its contents; consequently, the invoice embodies the written agreement of the parties.
The invoice unambiguously and clearly identifies the seller as Laser Fare. The U.C.C. defines seller as "a person who sells or contracts to sell goods." Section 6A-2-103(d). Furthermore, "whether a contract's terms are ambiguous is a question of law. A contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." Garden City Treatment Center, Inc. v. Coordinated HealthPartners, Inc., 852 A.2d 535, 543 (R.I. 2004) (citations omitted). If the court fails to find ambiguity, then the "intention of the parties must govern if that intention can be clearly inferred from the writing and if it can be fairly carried out in a manner consistent with settled rules of law." Westinghouse Broadcasting Co., Inc. v. Dial Media, Inc.,410 A.2d 986, 991 (R.I. 1980).
The invoice clearly shows that the seller of the lasers is Laser Fare, not Infinite. It is on Laser Fare stationery, which includes the Laser Fare logo and contact information. Laser Fare is designated as the payee on the invoice, and Spectra paid for the lasers by issuing a check to Laser Fare. Nothing on the invoice makes reference to Infinite or Laser Fare's relationship to Infinite. The assertion that Laser Fare is the seller is further supported by letters from Spectra to Laser Fare concerning whether the lasers met specifications and billing offsets. Additionally, Infinite has provided a copy of the contract between Laser Fare and the Russian laser supplier, Kvantex, for the acquisition of the lasers. This shows that Laser Fare was not merely an intermediary or conduit for Infinite but was, in fact, the sole party responsible for the sale of lasers to Spectra.
Spectra's evidence to the contrary must be excluded under the parol evidence rule. The parol evidence rule has been incorporated into the U.C.C. by § 6A-2-202, which states that, "terms with respect to which the confirmatory records of the parties agree . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. . . ." However, the terms may be supplemented or explained by evidence of course of dealing, as well as consistent additional terms, unless the court finds the record to have been intended to be a complete and exclusive statement of the terms of the agreement. Id. The evidence offered by Spectra included the deposition of Brockmyer where he states that (1) he was the President of Laser Fare and Infinite; (2) he negotiated the sale of the lasers; and (3) he never affirmatively informed Spectra that he was acting or contracting on behalf of Laser Fare. Spectra also include the affidavit of Lawandy, which states that he was unaware that Laser Fare was an independent company and that he thought that he was dealing with Infinite. The evidence proffered by Spectra falls within the parol evidence rule because it is extrinsic evidence that contradicts the written agreement of the parties. Because it is parol evidence, it must be excluded.
 Piercing the Corporate Veil
Spectra argues that even though Laser Fare is the seller under the contract, it should be allowed to sue Infinite because (1) Brockmyer, who was an officer of both companies, induced Spectra to believe that it was dealing with Infinite and, (2) Infinite dominates Laser Fare's affairs. In essence, Spectra asks the Court to pierce the corporate veil. The standard for piercing the corporate veil is dependent on the circumstances. Miller v. Dixon, 513 A.2d 597, 604 (R.I. 1986). However, as Justice Flanders so colorfully stated;
 "when it comes to piercing corporate veils, courts are loath to act like Vlad the Impaler. . . . Rather, respect for the legitimacy of the corporate form and its protective shield of limited liability usually dissuades courts from using their remedial swords to run them through, at least without extreme provocation to do so." Doe v. Gelineau, 732 A.2d 43, 44 (R.I. 1986). In general, the extreme provocation, to which Justice Flanders alludes, includes instances where the corporate entity is used to defeat public convenience, justify wrong, protect fraud or defend crime. Id. at 49. In the context of a parent-subsidiary relationship, demonstrated evidence that the parent dominated the finances, policies and practices of the subsidiary will justify piercing the corporate veil. Id. at 49. Nevertheless, "[t]he mere fact that there exists a parentsubsidiary relationship between the two corporations is insufficient reason to impose liability on the parent for the torts of the subsidiary." Miller, 513 A.2d at 604. Likewise, "[t]he mere fact that a person holds an office in two corporations that may be dealing with each other and that have offices in the same building, without more, is not enough to make them identical in contemplation of law." Gelineau, 732 A.2d at 49 (citing Stratford Credit Corp. v. Berman, 54 A.2d 404, 407 (R.I. 1947)). While piercing the corporate veil is usually invoked in tort, "a similar principle should be applied to liability for breach of contract. In fact, courts . . . in other jurisdictions have been less likely to ignore corporate forms in contract cases where the plaintiff has made a knowing and deliberate choice in dealing with a particular entity." Miller 513 A.2d at 604.
The type of conduct that will justify piercing the corporate veil is exemplified in National Hotel Associates v. O. Ahlborg Sons, Inc.,827 A.2d 646 (R.I. 2003). In this case, the plaintiff contracted for the renovation its hotel. During negotiations, Richard Ahlborg made certain representations to the plaintiff about his construction companies. Mr. Ahlborg was the principal of two construction companies, one union and one nonunion. He convinced the plaintiff that by contracting with his non-union company (CSI), the plaintiff would save money, but the quality of the work would be guaranteed by him personally and his other company (O. Ahlborg). This arrangement was possible, according to Mr. Ahlborg, because the two construction companies were "Siamese twins." In addition to being owned and operated by Mr. Ahlborg, the two companies shared the same offices, computers, personnel, vehicles and equipment. Mr. Ahlborg even boasted that "I am both companies," "he was CSI" and "he was O. Ahlborg."
During the construction, CSI experienced cash flow problems and fell behind schedule. At this point, CSI's construction manager was fired and replaced with O. Ahlborg's project manager, and O. Ahlborg advanced hundreds of thousands of dollars to CSI. Eventually, CSI initiated arbitration proceedings to recover payments that the plaintiff had withheld. The plaintiff counterclaimed and received a judgment against CSI for nonconforming and defective performance.
CSI never paid the judgment and in an attempt to shield CSI's assets (accounts receivables), it fraudulently transferred them to a new corporation. The Supreme Court allowed the plaintiffs to pierce the corporate veil and reach the assets of O. Ahlborg to satisfy its judgment. The holding was supported by the fact that the stock ownership of CSI and O. Ahlborg were the same, CSI was undercapitalized for almost all of its existence, CSI was dependent on O. Ahlborg for financial support, and CSI was not able to pay its judgment.
Comparing the factual situation in National Hotel and in the case at bar, it is clear that Spectra is not entitled to pierce the corporate veil. The evidence presented by Spectra shows that Laser Fare was a wholly owned subsidiary of Infinite and that Brockmyer was the president of both companies at the time of the transaction. However, this, without more, is not enough to justify piercing the corporate veil and consequently holding Infinite responsible for Laser Fare's breach of contract, if any. Spectra has not shown that Infinite dominated Laser Fare, that Laser Fare was undercapitalized or unable to pay a judgment.
Since Spectra has not presented any admissible evidence that creates a genuine issue of material fact, the next question is whether Spectra is entitled to summary judgment as a matter of law.
 Summary Judgment Is Appropriate as a Matter of Law
Infinite is entitled to summary judgment as a matter of law on the first count of the counterclaim because it cannot be held liable for a breach of contract to which it was not a party. As explained above, Infinite was not a party to the contract for the sale of lasers, and so the counterclaim must be dismissed as a matter of law.
 Spectra May Not Amend Its Complaint To Add Laser Fare as a Party
Whether to grant leave to amend is within the sound discretion of the trial justice. Wachsberger v. Pepper, 583 A.2d 77, 78 (R.I. 1990). Although leave to amend is "freely given when justice so requires," per Rule 15 of the Rhode Island Superior Court Rules of Civil Procedure, it is not appropriate in this case. Spectra seeks to add a cross-claim for breach of contract against a new party. Rule 15 does not contemplate granting leave to amend in this situation. Spectra's breach of contract claim is wholly unrelated to the stock sale, which forms the basis of this suit. Additionally, Laser Fare has no connection to this case, other than the fact that Brockmyer was an officer of both corporations.
Likewise, joinder under Rule 20 (a) would be inappropriate because Spectra does not seek to join Laser Fare as a co-plaintiff or co-defendant, but as a third-party. Furthermore, the breach of contract claim does not arise from the same transaction, occurrence, series of transactions or occurrences, or have a common question of law or fact. Rule 22 is not applicable either since Spectra is not seeking indemnity from Laser Fare; it is seeking damages. In sum, there is no procedural mechanism by which Laser Fare can be forced into this litigation. Spectra's request for leave to amend its complaint to add Laser Fare as a party must be denied.
 Intentional Interference
Spectra's second counterclaim is for intentional interference with advantageous relations. This tort is recognized in Rhode Island as intentional interference with prospective contractual relations.Mesolella v. Providence, 508 A.2d 661, 669-70 (R.I. 1986). In other jurisdictions it may be known as interference with prospective economic advantage, inducing refusal to deal, interference with reasonable expectancy or business relations. Id at 669, n. 9. Ultimately, the tort's moniker is of little importance because the elements essentially remain the same. For an intentional interference with prospective contractual relations claim, the plaintiff must prove (1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff. Id. at 669-70.
The Supreme Court elucidated the element of intent in Mesolella, where it said that, "malice, in the sense of spite or ill will, is not required; rather legal malice — an intent to do harm without justification — will suffice." Id. That means that a defendant will not be liable simply for committing an intentional act that interferes with a plaintiff's business relationships. Stop and Shop Supermarket Company v.Blue Cross Blue Shield of Rhode Island, 239 F.Supp. 2d 180, 194
(D.R.I 2003). The interference also must be impermissible or unjustified. Id. The plaintiff bears the initial burden of showing that the interference was not legally privileged or justified. Id. (citingBelliveau Bldg. Corp. v. O'Coin, 763 A.2d 622, 627 (R.I. 2000)). After the plaintiff has met its burden, the burden shifts to the defendant to show justification. Id.
 Disputed Issues of Material Fact
In this case, Spectra claims that Infinite intentionally interfered with its prospective contracts and business expectancies related to its plans for an IPO. Spectra began undertaking an IPO in January of 1998. Its Board of Directors, including Brockmyer, who remained on the Board until mid-1999, resolved that Lawandy should undertake the appropriate steps to achieve this goal, including searching for a management team and Chief Financial Officer (CFO). Over the next four years, Spectra hired a CFO, established required committees, engaged in due diligence, pursued underwriters and finally, in September 2002, filed its Registration Statement on Form S1 with the U.S. Securities and Exchange Commission. Three months later, in December 2002, Spectra ceased its efforts to undertake an IPO, after spending millions of dollars in the preparation.
Spectra alleges that the wasted money spent in preparation of the IPO and the unrealized future investment capital are damages that it suffered as a result of this lawsuit. Allegedly, when Infinite sued in August 1999, it cast a cloud on the company that deterred investment banks from investing capital. According to Spectra, "since this lawsuit called into question the integrity of Spectra and its CEO, Spectra was forced to continually explain to various bankers Spectra's potential exposure as well as various aspects of the case." Given the market conditions at the time, which were still unstable as a result of the Enron and WorldCom scandals, and the existence of the lawsuit, Spectra withdrew its Registration Statement.
In support of its claim that the present lawsuit constitutes an intentional interference with prospective contracts, Spectra points to the following facts, which are supported by affidavits, answers to interrogatories and depositions. Brockmyer was on Spectra's Board at the time it was resolved to undertake the IPO, so he had knowledge of the expectancy. Brockmyer did not attend the March 1999 Board meeting where the sale of Spectra stock was approved, nor did he ever raise any question regarding the resale. Additionally, Spectra alleges that Infinite did not investigate its claim regarding the stock resale prior to filing the claim and the claim is in fact unsubstantiated. From this, Spectra concludes, the actions of Brockmyer and Infinite show that the lawsuit was intentionally filed in order to interfere with the IPO and harm Spectra.
In its defense, Infinite presented evidence to this Court in connection to the sale and resale of Spectra stock, which indicates that perhaps Infinite was justified in bringing this suit. This included correspondence between the officers of Infinite, Spectra, and both existing and new investors, as well as discovery materials. In view of the conflicting evidence that the two parties have submitted, it is clear that summary judgment is not appropriate because disputed issues of material fact exist.
 Conclusion
After due consideration of the arguments advanced at oral argument and in their memoranda, this Court finds summary judgment on Infinite's motion for summary judgment on the first counterclaim for breach of contract should be granted because Laser Fare is not a party to the contract for the sale of lasers to Spectra. Furthermore, Spectra may not amend its counterclaim to add Laser Fare as a party. Because disputed issues of material fact exist regarding the second counterclaim for intentional interference with a prospective contract, summary judgment on that count is denied. Heretofore, this Court has ordered that to the extent that the counterclaims withstood dispositive motions, they — or either of them — would be severed for trial purposes, that Infinite's claims against Spectra would be tried first, and, thereafter, the same jury would try Spectra's counterclaim(s) against Infinite. Counsel shall submit an appropriate order consistent with this decision.
[1] The invoice reflects that on December 10, 1996 Brockmyer authorized the sale of an additional laser, bringing the total sale of lasers to four.